CAPITAL RESOURCES, LLC, AND INSTITUTION FOOD HOUSE, INC., PLAINTIFFS, v. CHELDA, INC., CHARLOTTE METRO RESTAURANTS, LLC, BARN DINNER THEATRE, INC., MAKE SENSE OF DINING OF FLORIDA, LLC, MAKE SENSE DINING, INC., BUSTER'S GRILL, LLC, DABNEY C. ERWIN AND CHARLES B. ERWIN, DEFENDANTS.

No. COA12-288

(Filed 6 November 2012)

**1  Jurisdiction—subpoenas—out-of-state courts—no jurisdiction to quash**

The trial court lacked jurisdiction in an action for recovery of the unpaid balance and interest on a contract and promissory note to quash certain subpoenas. A superior court judge in this State does not have any authority over the courts of other states, and thus, to the extent the trial court purported to quash subpoenas issued by courts in other states, those portions of the order were void and to no effect. However, to the extent the entities in question failed to comply with the subpoenas, defendant's rem-

**CAPITAL RES., LLC v. CHELDA, INC.**

[223 N.C. App. 227 (2012)]

edy was to initiate contempt or other proceedings in those states' courts as provided for by their rules of civil procedure.

## 2. Contracts—breach of contract—unfair and deceptive trade practices—no evidence in support of claims

The trial court did not err in an action for recovery of the unpaid balance and interest on a contract and promissory note by entering directed verdicts for plaintiff on defendant Chelda's counterclaims for breach of contract and breach of the covenant of good faith and fair dealing, and its counterclaim brought pursuant to Chapter 75. No evidence was presented that would have supported verdicts for Chelda on its contract and Chapter 75 counterclaims.

## 3. Unfair Trade Practices—jury instructions—intent—action not commercial bribery

The trial court did not err in submitting issues and instructing the jury on defendant Chelda's Chapter 75 counterclaim arising out of alleged commercial bribery. The trial court properly instructed the jury on intent as to the first prong of the commercial bribery statute and plaintiff's actions did not constitute commercial bribery, nor were they "unfair" or "deceptive."

Appeal by Defendants Chelda, Inc., Barn Dinner Theatre, Inc., Make Sense Dining of Florida, LLC, Make Sense Dining, Inc., and Charles B. Erwin from order entered 28 February 2011 and judgment entered 26 April 2011 by Judge Eric L. Levinson in Catawba County Superior Court. Heard in the Court of Appeals 29 August 2012.

*Katten Muchin Rosenman, LLP, by Christopher A. Hicks and David B. Morgen, for Plaintiff.*

*Roberts & Stevens, P.A., by Mark C. Kurdys, for Defendants Chelda, Inc., Barn Dinner Theatre, Inc., Make Sense Dining of Florida, LLC, Make Sense Dining, Inc., and Charles B. Erwin.*

STEPHENS, Judge.

Defendants Chelda, Inc., Barn Dinner Theatre, Inc., Make Sense Dining of Florida, LLC, Make Sense Dining, Inc., and Chelda, Inc. CEO Charles B. Erwin ("Erwin") (collectively, "Chelda")[1] appeal from

1. All claims against Defendant Ham's Restaurant, Inc. were dismissed without prejudice on 1 December 2009 after Ham's began bankruptcy proceedings. Although no dismissal appears in the record before this Court, other documents in the record

**CAPITAL RES., LLC v. CHELDA, INC.**

[223 N.C. App. 227 (2012)]

(1) an order granting motions by Plaintiff Capital Resources, LLC, and Plaintiff-Intervenor Institution Food House, Inc., (collectively, "IFH") for a protective order and to quash subpoenas *duces tecum*, and (2) from judgment entered upon a jury verdict following the granting of IFH's motion for directed verdict as to Chelda's counterclaims in an action filed by IFH for recovery of the unpaid balance and interest on a contract and promissory note. We vacate in part the order appealed from, but affirm the judgment entered.

Chelda owns various restaurants and restaurant chains, including the corporate defendants named in the caption of this opinion. IFH is a distributor of food to restaurants and chains. IFH does not manufacture food, but instead orders, warehouses, and delivers food products from manufacturers to restaurants, essentially serving as a "middleman" between the manufacturers and restaurants. Capital Resources is a financial services affiliate of IFH. Chelda manages several restaurants and chains and, between 1997 and 2009, IFH sold and delivered food products to Chelda. The evidence at trial relevant to this appeal primarily concerns two sources of income to IFH and a bonus scheme Erwin arranged with a longtime employee: (1) markup percentages on food products which IFH charged Chelda for providing food products, (2) marketing allowances IFH charged some food product manufacturers for advertising and other marketing services, and (3) bonus payments consisting of percentages of savings resulting from the employee's negotiation of lower prices for certain food products.

Compensation for IFH's services to Chelda was outlined in a series of Product Purchase Agreements ("PPA") negotiated over the years between the parties. According to the PPA, the price Chelda paid IFH for food products was IFH's cost plus a certain markup percentage listed in an attachment to the PPA. Because food product prices change frequently, the specific prices IFH charges for food

---

suggest that Defendant Charbuck, Inc. was likewise dismissed after entering bankruptcy. A motion for summary judgment by Defendant Charmike Holdings, LLC, was granted by order entered 11 January 2010. In that order, judgment was entered against Charmike for $132,976.70 plus costs and interest, and any remaining claims were dismissed with prejudice. Nothing in the record indicates how claims against Defendants Charlotte Metro Restaurants, Inc., and Buster's Grill, LLC, were resolved, but neither of these defendants is named or mentioned in the text of any documents filed by Defendants' trial counsel once trial began. Defendant Dabney C. Erwin likewise is not named in the text of those filings, but she clearly remained a party to the action as judgment was entered against her, along with her husband, Erwin, by the trial court on 26 April 2011. In any event, none of the defendants discussed in this footnote, including Dabney C. Erwin, gave notice of appeal and thus none are parties to this appeal.

products are not listed in the PPA. Instead, food prices are listed in separate "pricing schedules," unique to each customer and updated weekly by IFH, and the PPA lists only the markup percentage IFH will apply to the prices listed in the weekly pricing schedules. All PPAs between the parties were essentially identical, except for changes in the markup percentages.

For many food products, IFH handled all aspects of supplying Chelda, including negotiating the best prices with manufacturers. In addition, IFH allowed restaurant customers like Chelda a "direct negotiation option," under which restaurants negotiate prices directly with manufacturers. Under the direct negotiation option, if Chelda negotiated a lower price from a manufacturer than what IFH had secured, IFH would put the directly negotiated price into IFH's pricing schedule. IFH would then determine its charge to Chelda by applying the appropriate markup percentage listed in the PPA to the directly negotiated price. In such circumstances, Chelda would receive the benefit of its successful negotiation skills, while IFH would still be compensated for its services in ordering, warehousing, and delivering the food products.

From 2001 to 2008, Steven Stern was a purchasing manager for Chelda, in charge of direct negotiations with food product manufacturers. To "incentivize" Stern, Erwin set up a bonus program whereby if Stern secured savings to Chelda for one year on a food product, Stern would receive half the savings during the first ninety days as a bonus and Chelda would retain all savings after ninety days. IFH agreed to assist Chelda with implementing this bonus program. At trial, the assistance from IFH and the route of bonus payments to Stern was disputed: IFH claimed Chelda requested that IFH send bonus payments consisting of half of the amount saved directly to Stern, which is what in fact occurred, while Chelda claimed it had requested only the information on savings from IFH and had intended that bonus payments to Stern be paid through Chelda. Erwin testified that he only learned of the direct payments from IFH to Stern in late June 2008.

IFH also presented evidence of a common restaurant industry practice known as "marketing allowances." Marketing allowances are funds that food manufacturers pay the distributors of their products, usually as a lump sum or a percentage of the volume of a product ordered by a distributor. Distributors like IFH use marketing allowances to promote the manufacturer's food products in a variety of ways, including: hosting food shows, training chefs and menu

developers, sponsoring events for customers, and advertising in the distributor's catalog. IFH collects marketing allowances from some manufacturers after an order is placed, essentially "back-billing" the manufacturer for advertising that IFH performed prior to the order. IFH has marketing allowance programs with many manufacturers, billing them, on average, seven percent of invoiced costs of food products ordered. Marketing allowances are negotiated solely between IFH and food product manufacturers. Thus, IFH does not give credit for marketing allowances to customers, such as Chelda, nor are marketing allowances mentioned in contracts with customers, like the PPA.

In April 2008, prior to Erwin's alleged discovery of the direct payments to Stern, Chelda was $2 million behind on payments due IFH under the PPA. Chelda and IFH agreed to reduce this debt to a promissory note, with monthly payments of approximately $10,000 and a balloon payment due 1 May 2009. When Chelda failed to make the balloon payment, Capital Resources initiated this action by filing a complaint on 20 May 2009. Plaintiffs' amended complaint was filed 9 June 2009. By order entered 10 January 2010, IFH was joined as an intervenor-plaintiff.

On 7 January 2010, Chelda filed an answer and counterclaim, alleging seven claims for relief: two claims each of civil conspiracy (claims 1 and 5) and breach of the duty of good faith and fair dealing (claims 2 and 4), and one claim each of breach of contract (claim 3), constructive fraud (claim 6), and unfair and deceptive trade practices (claim 7). These counterclaims were based on two primary allegations: (1) that, as a result of IFH paying bonuses to Stern directly, Chelda never realized any of the "post-ninety-day" savings as intended under Erwin's bonus scheme, and (2) that the cost to which the PPA markups applied should have included adjustments based on IFH's receipt of marketing allowances from manufacturers through back-billing.

Chelda substituted counsel twice, in January and October 2010. On no fewer than five occasions between September 2009 and October 2010, Chelda requested a continuance to conduct more discovery. In January 2011, Chelda filed nine motions for orders of commission for out-of-state subpoenas *duces tecum* to non-party manufacturers that conducted business with IFH ("the 2011 Subpoenas"). The 2011 Subpoenas were issued on a rolling basis and sought information on marketing allowances paid to IFH by various manufacturers during the ten-year relationship between IFH and

CAPITAL RES., LLC v. CHELDA, INC.

[223 N.C. App. 227 (2012)]

Chelda. The Honorable Timothy Kincaid, Catawba County Superior Court, granted each motion and issued orders of commission. On 26 January 2011, IFH filed a motion for a protective order and a motion to quash the 2011 Subpoenas.[2]

On 21 February 2011, the Honorable Eric L. Levinson, Catawba County Superior Court, presided over a hearing on IFH's motions. By order entered 28 February 2011, Judge Levinson entered a protective order quashing the 2011 Subpoenas and ordering Chelda to consult with IFH before obtaining any additional subpoenas *duces tecum*. On 23 February 2011, Chelda sought a continuance of the pending trial claiming a denial of opportunity to obtain evidence, which was denied. On 4 March 2011, Chelda moved this Court for a temporary stay of proceedings, which was also denied.

On 7 March 2011, the case went to trial. At the close of evidence, IFH and Chelda each moved for a directed verdict with respect to the other's claims. Chelda withdrew its counterclaims 1, 5, and 6. The court denied Chelda's motion and granted IFH's motion as to Chelda's counterclaims 2, 3, 4, and, in part, 7. The jury found that Chelda had breached the PPA and promissory note and that IFH was entitled to damages totaling $2,489,422.82. The jury found that neither party committed unfair and deceptive trade practices. Chelda appeals from the trial court's order entered 28 February 2011 issuing a protective order and quashing the 2011 Subpoenas and from judgment entered upon the jury's verdict 26 April 2011 following the trial court's granting a directed verdict to IFH on Chelda's counterclaims.

*Discussion*

On appeal, Chelda brings forward three arguments: that the trial court erred in (1) quashing the 2011 Subpoenas; (2) issuing a directed verdict dismissing Chelda's counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices related to IFH's marketing allowances; and (3) submitting the issues and instructing the jury as to Chelda's coun-

2. Previously, on 8 June 2009, Chelda filed a separate complaint in Guilford County Superior Court against IFH, alleging the same theories Chelda alleges as defenses and counterclaims here. On 8 June 2009, Chelda issued subpoenas *duces tecum* to several out-of-state manufacturers ("2009 Subpoenas"). The 2009 Subpoenas were identical to the 2011 Subpoenas at issue in this appeal—requesting information on marketing allowances paid to IFH—and sent to many of the same manufacturers. After IFH moved for a protective order, Chelda dismissed that lawsuit in October 2009 without pursuing a motion to compel. Discovery served on IFH in this case did not seek information or documents related to marketing allowances.

terclaim for unfair and deceptive trade practices arising out of commercial bribery.[3] We vacate in part and affirm in part.

## I.  The 2011 Subpoenas

[1]  Chelda makes two contentions of error with respect to the trial court's 28 February 2011 order regarding the 2011 Subpoenas: (1) the trial court lacked jurisdiction to quash the 2011 Subpoenas because they were issued by other jurisdictions, and (2) the court abused its discretion in quashing the 2011 Subpoenas because it based its decision on speculation.[4] We agree that the trial court lacked jurisdiction to quash the subpoenas. Accordingly, we do not address Chelda's abuse of discretion argument.

The 28 February 2011 order states that the trial court is allowing IFH's motions "for protective orders and to quash various subpoenas *duces tecum*[.]" The order then provides "that each out-of-state subpoena . . . be and hereby are [sic] quashed" and that a copy of the order be served upon "the recipient of any such subpoena and to each [out-of-state] Clerk of Court to whom such a subpoena was directed." The order also provides that Chelda not serve any additional subpoenas *duces tecum* without properly notifying IFH and obtaining authorization from the trial court.[5]

---

3. Chelda also lists an additional "Issue Presented" in its brief, to wit, that the trial court erred in awarding Capital Resources attorney's fees in the amount of 15% of the jury award for damages due on the promissory note, but by failing to argue this issue in the text of the brief, Chelda abandons this challenge.

4. In its brief, Chelda also argued that Judge Levinson did not have the authority to quash the 2011 Subpoenas because they were issued upon orders of commission entered by Judge Timothy Kincaid, and thus Judge Levinson's order in effect "overruled" that of another superior court judge. However, at oral argument, Chelda explicitly withdrew this contention, and we do not address it here.

5. Rule 5(a) of the North Carolina Rules of Civil Procedure provides that "every paper relating to discovery required to be served upon a party unless the court otherwise orders, every written motion other than one which may be heard *ex parte*, and every written notice, . . . shall be served upon each of the parties[.]" N.C. Gen. Stat. § 1A-1, Rule 5(a) (2012). "This Court has held the General Assembly's use of the word 'shall' [in Rule 5(a)] establishes a mandate, and failure to comply with the statutory mandate is reversible error." *In re D.A.*, 169 N.C. App. 245, 247-48, 609 S.E.2d 471, 472 (2005) (citation omitted). However, Chelda failed to serve IFH with any of its motions for commissions and the parties have also stipulated that Judge Kinkaid issued *all* of the commissions *ex parte* and without any notice to IFH. In addition, many, but not all, of Chelda's motions for commission falsely stated that they were made "upon the consent of all interested parties." As noted in the parties' "Stipulation to Correct Inaccuracies in the Record on Appeal," Chelda made no effort to confer with IFH about the motions and IFH had not consented to them. Thus, all of the orders of commission issued in response to Chelda's motions were procedurally flawed and many were issued upon a mistake of fact.

It is well-established that, because the primary duty of a trial judge is to control the course of the trial so as to prevent injustice to any party, *State v. Britt*, 285 N.C. 256, 271-72, 204 S.E.2d 817, 828 (1974), the judge "has broad discretion to control discovery[.]" *State v. Almond*, 112 N.C. App. 137, 148, 435 S.E.2d 91, 98 (1993) (citation omitted). For example, Rule 26 of the North Carolina Rules of Civil Procedure provides, in pertinent part:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the judge of the court in which the action is pending *may make any order which justice requires to protect a party or person from unreasonable annoyance, embarrassment, oppression, or undue burden or expense*[.]

N.C. Gen. Stat. § 1A-1, Rule 26(c) (2012) (emphasis added). Among the orders that Rule 26(c) authorizes a trial court to enter are:

> (i) that the discovery not be had;

> (ii) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; [and]

> (iii) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery[.]

*Id.* Protective orders issued pursuant to Rule 26(c) are left to the trial court's discretion and will only be disturbed for an abuse of discretion. *Hartman v. Hartman*, 82 N.C. App. 167, 180, 346 S.E.2d 196, 203, *cert. denied as to additional issues*, 318 N.C. 506, 349 S.E.2d 860 (1986), *affirmed*, 319 N.C. 396, 354 S.E.2d 239 (1987).

We agree with Chelda that a superior court judge in this State does not have any authority over the courts of other states, and thus could not quash subpoenas issued by such courts. *See, e.g., Irby v. Wilson*, 21 N.C. 568, 580 (1837) (observing that a State "has no power to enact laws to operate upon things or persons not within her territory; and if she does, although her domestic tribunals may be bound by them, those of other countries are not obliged to observe them, and are not at liberty to enforce them"). Thus, to the extent Judge Levinson purported to quash the 2011 Subpoenas issued by courts in other states, those portions of the order were void and to no effect. The out-of-state courts should certainly have realized Judge Levinson had no authority over them or their subpoenas, and those courts could simply have ignored the copy of the order Judge Levinson requested be served upon them.

However, our agreement with Chelda that the 28 February 2011 order's attempt to quash the 2011 Subpoenas was void does not permit us to offer any further relief to Chelda as to the documents sought thereunder. As Chelda notes, it is the out-of-state courts which retained authority and jurisdiction with regard to the 2011 Subpoenas, and it is in those courts that Chelda had recourse to enforce them. Had Chelda wished to proceed with its attempt to obtain documents under the 2011 subpoenas, Chelda could have requested those out-of-state courts to notify the subpoena recipients that Judge Levinson's order was to no effect. To the extent the entities in question failed to comply with the subpoenas, Chelda's remedy was to initiate contempt or other proceedings in those states' courts as provided for by their rules of civil procedure. Had Chelda thus obtained any documents it felt relevant to this action, it could have attempted to introduce such in this case. At that point, IFH might or might not have sought a protective order, which the trial court here might or might not have allowed.

However, these speculations are merely that, and are thus unavailing to Chelda. The record before us is silent on any actions Chelda may have undertaken in the courts of other states or the content of any documents it thus obtained. The only conclusion the record thus permits is that Chelda failed to pursue its subpoenas. Given this failure, we cannot conclude that Chelda was deprived of the opportunity to obtain and present evidence in support of its cases.[6] Thus, while we vacate the portion of the order purporting to quash the subpoenas, we can offer no further relief to Chelda.

## II. Directed Verdict

[2] Chelda next argues that the trial court erred by entering directed verdicts for IFH on Chelda's counterclaims for breach of contract and of the covenant of good faith and fair dealing, and its counterclaim

---

6. We also note that, despite his error in attempting to "quash" the out-of-state subpoenas, Judge Levinson unquestionably had both the jurisdiction and authority to enter a Rule 26(c) protective order as part of his duty to control discovery in the case before him. As noted *supra*, the 28 February 2011 order also allowed IFH's motions for a protective order, and, as expressly permitted by Rule 26(c)(ii), ordered "that the discovery may be had only on specified terms and conditions[,]" to wit, that Chelda consult with and properly notify IFH prior to serving any additional subpoenas. Chelda has not brought forward any argument based on this portion of the order, and in any event, we observe no abuse of discretion in this portion of the order.

CAPITAL RES., LLC v. CHELDA, INC.

[223 N.C. App. 227 (2012)]

brought pursuant to Chapter 75, to the extent that claim related to the marketing allowances IFH received from food product manufacturers.[7] Specifically, Chelda contends that the court improperly concluded that the PPA precluded parol evidence. We disagree.

On appeal, our standard of review of a directed verdict granted at the close of all evidence is whether the evidence, taken in the light most favorable to the non-movant, is sufficient to go to the jury. *Ligon v. Strickland*, 176 N.C. App. 132, 135-36, 625 S.E.2d 824, 828 (2006). "It is only when the evidence is insufficient to support a verdict in the non-movant's favor that the motion should be granted." *Id.* Further, "[i]f, at the close of the evidence, a plaintiff's own testimony has unequivocally repudiated the material allegations of his complaint and his testimony has shown no additional grounds for recovery against the defendant, the defendant's motion for a directed verdict should be allowed." *Cogdill v. Scates*, 290 N.C. 31, 44, 224 S.E.2d 604, 611 (1976).

"[W]here the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty, it is presumed that the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing." *Franco v. Liposcience, Inc.*, 197 N.C. App. 59, 70, 676 S.E.2d 500, 507, *affirmed*, 363 N.C. 741, 686 S.E.2d 152 (2009) (citations and quotation marks omitted). As a result, "[t]he parol evidence rule prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is used to contradict, vary, or explain the written instrument." *Carolina First Bank v. Stark, Inc.*, 190 N.C. App. 561, 568, 660 S.E.2d 641, 646 (2008) (citation and quotation marks omitted). However, "when a part of the contract is in parol and part in writing, the parol part can be proven if it does not contradict or change that which is written." *Hoots v. Calaway*, 282 N.C. 477, 486, 193 S.E.2d 709, 715 (1973) (citation and quotation marks omitted).

In support of its contract and Chapter 75 counterclaims, Chelda alleged that IFH had fraudulently concealed from Chelda the existence of the marketing allowances it received from some food manufacturers. Chelda alleged it intended that the markup percentages

---

7. The trial court denied IFH's motion for directed verdict as to Chelda's counterclaim for unfair and deceptive trade practices to the extent that counterclaim relied on the direct payments of funds from IFH to Stern. To the extent Chelda's Chapter 75 counterclaim arose from those payments, the issue went to the jury and is addressed in section III of this opinion.

CAPITAL RES., LLC v. CHELDA, INC.

[223 N.C. App. 227 (2012)]

listed in the attachment to the PPA be applied not to the negotiated prices listed in the pricing schedules, but rather, to the listed prices less any marketing allowances IFH was to receive from food manufacturers. Chelda asserted that, as a result of IFH's receipt of marketing allowances, IFH actually paid less for the food products than the price IFH represented to Chelda as its cost, which in turn Chelda contends fraudulently inflated the amount Chelda paid IFH as markup. Chelda characterized these circumstances as both a breach of the terms of the PPA and unfair and deceptive conduct in or affecting commerce pursuant to Chapter 75.

We begin by noting that we can find no "conclusion" by the trial court that parol evidence was precluded by the PPA nor any suggestion that parol evidence was actually excluded from admission at trial. To the contrary, the trial court permitted witnesses for both sides to testify at length about their intent and understanding of the PPA. Indeed, although Chelda's brief states that "witnesses would supplement the PPA with [p]arol [e]vidence, [sic] which does not contradict or change the writing, namely that the PPA was a 'cost-plus contract,'"[8] a few sentences later Chelda admits that "both parties agree and understood that pricing under the PPA was 'cost[-]plus.' "

The true dispute at trial was to what "cost" the "plus" (or markup) was intended to be applied. Chelda asserts the need for parol evidence on this point and cites definitions from legal dictionaries and case law from various other jurisdictions which state, in essence, that under a cost-plus contract, the "cost" to which any markup is applied is the "seller's own cost[,]" *Tip Top Farms v. Dairylea Coop.*, 114 A.D.2d 12, 20 (N.Y. App. Div. 1985), with the buyer (here, Chelda) "get[ting the] advantage of all profits." *Grothe v. Erickson*, 59 N.W.2d 368, 370 (Neb. 1953). Chelda appears to argue that IFH's "own cost" is the cost negotiated with the manufacturer less any marketing allowances that manufacturer paid IFH. However, none of the cost-plus definitions Chelda relies upon suggests that a distributor's "cost" of food *products* purchased from a manufacturer is determined by offsetting payments it receives from providing entirely separate *services* to the manufacturer.

Our review of the trial transcript reveals that Erwin explicitly testified that he was unaware of the existence of marketing allowances,

---

8. While the term "cost-plus" does not appear in the PPA, Chelda uses this term to refer to the system of percentage markups on the cost of various food products that IFH charged Chelda per the PPA and its attachments.

either as a general industry practice or as a specific practice by IFH. The undisputed evidence at trial also established that IFH did not discuss marketing allowances with restaurants it supplied because the marketing allowances were payments for marketing services IFH provided to the manufacturers. Our review of the record further reveals that the PPA does not mention marketing allowances and explicitly provides that IFH's markups would be applied to the cost of the items as negotiated with manufacturers. We can find no evidence that IFH ever agreed to offset the marketing allowances it received against the negotiated prices for the food products or to otherwise account for the marketing allowances *vis à vis* the markups it charged Chelda pursuant to the PPA. Rather, all of the evidence indicates that the payment of marketing allowances was an arrangement for certain services between IFH and the food manufacturers it did business with, unrelated to IFH's PPA with Chelda.

In sum, the uncontradicted evidence at trial established that (1) Erwin was unaware of marketing allowances and thus cannot have intended that they be considered in determining prices to be marked up under the PPA; (2) marketing allowances were payments for IFH services provided to manufacturers and therefore unrelated to the cost of food products negotiated by IFH or directly by its restaurant customers; (3) in light of fact 2, IFH's "own cost" of food products did not include an offset for marketing allowances, but rather consisted of the cost negotiated with a manufacturer (whether by IFH or the restaurants directly); and thus, (4) the negotiated cost for each product listed in the pricing schedules was the proper "cost" to which IFH's markups (as contracted with Chelda) were applied. Because no evidence was presented that would have supported verdicts for Chelda on its contract and Chapter 75 counterclaims, the trial court's entry of directed verdicts in favor of IFH was proper. Accordingly, this argument is overruled.

### III. Jury Issues

[3] Chelda also argues that the trial court erred in submitting issues and instructing the jury about Chelda's Chapter 75 counterclaim arising out of alleged commercial bribery, namely, the payments from IFH to Stern. Specifically, Chelda asserts error in the court's instruction that this counterclaim required proof of IFH's intent to influence Stern's purchasing decisions to the benefit of IFH and the detriment of Chelda. We disagree.

**CAPITAL RES., LLC v. CHELDA, INC.**

[223 N.C. App. 227 (2012)]

Section 75-1.1 of our General Statutes states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a) (2012).[9] To prevail on a UDTP claim, a "[p]laintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Kewaunee Scientific Corp. v. Pegram*, 130 N.C. App. 576, 580, 503 S.E.2d 417, 420 (1998) (citation and quotation marks omitted). A practice is properly deemed unfair "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. . . . [or] amounts to an inequitable assertion of . . . power or position." *McInerney v. Pinehurst Area Realty, Inc.*, 162 N.C. App. 285, 289, 590 S.E.2d 313, 316-17 (2004) (citations and quotation marks omitted). To prove deception, while "it is not necessary . . . to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, [a] plaintiff must, nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 452-53, 279 S.E.2d 1, 7 (1981).

As both parties note, the intent and knowledge of the parties is generally irrelevant in UDTP actions:

> A UDTP claimant need not establish the defendant's bad faith, intent, willfulness, or knowledge. Our Supreme Court explained that state courts have generally ruled that the consumer need only show that an act or practice possessed the tendency or capacity to mislead, or created the likelihood of deception, in order to prevail under the states' unfair and deceptive practices act. Thus, if unfairness and deception are gauged by consideration of the effect of the practice on the marketplace, it follows that the intent of the actor is irrelevant. Good faith is equally irrelevant. . . .

> Moreover, not only is the defendant's intent irrelevant when evaluating a UDTP claim, the plaintiff's intent and conduct is also irrelevant.

*Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 452, 678 S.E.2d 671, 683-84 (2009) (citations, quotation marks, and brackets omitted).

---

9. In our State's case law, claims brought under Chapter 75 are often referred to as "unfair and deceptive trade practices" or "UDTP" claims, referencing language used in previous versions of the Chapter. For ease of reading, we use the term UDTP here.

Here, however, Chelda specifically predicated its UDTP counterclaim upon allegations that Stern's receipt of bonus payments directly from IFH constituted the crime of commercial bribery. N.C. Gen. Stat. § 14-353 (2012). Under section 14-353, four categories of acts are criminalized. *Id.* Chelda's counterclaim was based upon acts falling under the first and fourth prongs of the statute:

> Any person who gives, offers or promises to an agent, employee or servant any gift or gratuity whatever *with intent to influence his action* in relation to his principal's, employer's or master's business [is guilty of commercial bribery];
>
> . . .
>
> [A]ny person who gives or offers [an employee authorized to procure materials by purchase or contract for his employer a] commission, discount or bonus [is guilty of commercial bribery.]

*Id.* (emphasis added); *see also State v. Brewer*, 258 N.C. 533, 552-53, 129 S.E.2d 262, 276-77, *appeal dismissed*, 375 U.S. 9, 11 L. Ed. 2d 40 (1963).

In *Brewer*, our Supreme Court concluded that acts constituting commercial bribery under the first prong could be the basis of a UDTP claim, and that in such cases, "[t]he intent specified [in the statute] is an essential element of the offense." *Id.* at 552, 129 S.E.2d at 276-77. Thus, while a defendant's intent need not be established to support most UDTP claims, where the UDTP claim rests upon an allegation under the first prong of the commercial bribery statute, proof of the defendant's intent to influence the actions of another's employee must be proven. *See id.*

Chelda further contends that, even if "intent to influence" is an element of the offense of UDTP arising from commercial bribery under prong one, the court erred in instructing the jury that IFH's intent must have been specifically that Stern act to benefit IFH and harm Chelda. In. other words, Chelda asserts that IFH committed commercial bribery if it intended to "influence" Stern in *any* way, whether helpful, harmful, or unrelated to Chelda's or IFH's business interests. We find this assertion nonsensical. The statute in question is titled "Influencing agents and servants in violating duties owed employers." N.C. Gen. Stat. § 14-353. In addition "commercial bribery" is defined as "[c]orrupt dealing with the agents or employees of prospective buyers to secure an *advantage* over business competitors." Black's Law Dictionary 204 (8th ed. 2007) (emphasis added). As reflected by the statute's title and the very definition of the term, as

CAPITAL RES., LLC v. CHELDA, INC.

[223 N.C. App. 227 (2012)]

well as by common sense, commercial bribery involves an inducement to give the bribe-giver an unfair advantage or benefit in a business relationship. Surely our General Assembly did not intend that a payment made by IFH to influence Stern to undermine IFH's business relationship with Chelda or to work harder and more efficiently on behalf of Chelda be criminalized as commercial bribery. Rather, we conclude that acts of commercial bribery must result in (or be intended to result in) some disloyalty or harm to the employer and some benefit to the bribe-giver. *See, e.g., Kewaunee Scientific Corp.,* 130 N.C. App. at 581, 503 S.E.2d at 420 (holding that where a UDTP claim is based upon commercial bribery, "commercial bribery harms an employer as a matter of law, with damages measured at a minimum by the amount of the commercial bribes"). Accordingly, the trial judge properly instructed the jury on intent as to the first prong of the commercial bribery statute.

We next turn to Chelda's contention that the trial court erred in refusing to instruct the jury under the fourth prong under section 14-353: "any person who gives or offers [an employee authorized to procure materials by purchase or contract for his employer a] commission, discount or bonus [is guilty of commercial bribery.]" N.C. Gen. Stat. § 14-353. As Chelda notes, unlike the first prong of the commercial bribery statute, the fourth prong does not explicitly mention "intent to influence." Thus, Chelda contends that, even without any proof of intent to influence Stern, IFH's payments to Stern were enough to establish commercial bribery and support their UDTP claim. At trial, Chelda sought an instruction under this prong in support of its UDTP claim, but the court denied the request. After careful review, we believe the trial court's decision was correct.

As noted above, the proper title of the commercial bribery statute is "Influencing agents and servants in violating duties owed employers." N.C. Gen. Stat. § 14-353. Where the undisputed evidence at trial shows that the plaintiff himself has designed and established the system of payments in question with the explicit purpose of rewarding an employee's diligence, we hold that the cooperation of a defendant in facilitating such a scheme *at the plaintiff's request cannot* constitute "influencing agents" to violate their duties to their employers. Here, Erwin testified that it was he who conceived of the bonus payments to Stern, with the intent that they "incentivize" Stern to secure the lowest prices on behalf of Chelda. According to Erwin's own testimony, Stern only received the payments when he secured lower prices on food products, to the benefit of Chelda. No evidence was

**EXECUTIVE MED. TRANSP., INC. v. JONES CNTY. DEP'T OF SOC. SERVS.**

[223 N.C. App. 242 (2012)]

presented that Stern received bonus payments in any circumstance other than when he obtained *better* pricing for Chelda. Further, Erwin was aware that Stern was receiving payments directly from IFH. A number of bonus payment checks from IFH to Stern were introduced at trial. Due to a computer error, the third bonus payment check sent by IFH was made out to Chelda, rather than to Stern. This check, dated 23 August 2003, was endorsed "to Steve Stern from Chelda, Inc., by Charles B. Erwin, President[.]" In such circumstances, IFH's actions did not constitute commercial bribery, nor were they either "unfair" or "deceptive." *See McInerney*, 162 N.C. App. at 289, 590 S.E.2d at 316-17; *Overstreet*, 52 N.C. App. at 452-53, 279 S.E.2d at 7. This argument is overruled.

VACATED IN PART; AFFIRMED IN PART.

Judges CALABRIA and ELMORE concur.