IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-890

Filed: 21 May 2019

Pitt County, No. 14 CVS 2408

HILLS MACHINERY COMPANY, LLC, Plaintiff,

v.

PEA CREEK MINE, LLC, JOC FARMS, LLC, and JOSEPH D. BRILEY, JR., Defendants.

v.

JOC FARMS, LLC and PEA CREEK MINE, LLC, Counterclaim and Third-Party Plaintiffs,

v.

HILLS MACHINERY COMPANY, LLC, Counterclaim Defendant, and CNH INDUSTRIAL AMERICA, LLC d/b/a CASE IH, Third-Party Defendant.

Appeal by JOC Farms, LLC from order entered 1 May 2018 by Judge Alma L. Hinton in Pitt County Superior Court. Heard in the Court of Appeals 26 March 2019.

*Stevens Martin Vaughn & Tadych, PLLC, by Michael J. Tadych, for third-party plaintiff-appellant JOC Farms, LLC.*

*Womble Bond Dickinson (US) LLP, by Jamie A. Dean and Ryan H. Niland, for third-party defendant-appellee CNH Industrial America, LLC.*

TYSON, Judge.

JOC Farms, LLC ("JOC") appeals from the trial court's order, which granted CNH Industrial America, LLC, d/b/a Case IH ("Case") summary judgment on JOC's claims for breach of warranty, fraud, and unfair and deceptive trade practices. We affirm the trial court's order.

## I. Background

JOC purchased a 2006 model 921C loader (the "Loader") manufactured by Case from Briggs Construction Equipment, Inc. ("Briggs") on or about 30 April 2009. Briggs had previously purchased the Loader from Case on 29 August 2008. Case had issued a manufacturer's warranty (the "Case Warranty") for the Loader. The Case Warranty states, in relevant part:

**What's Covered**

> *If a defect in material or workmanship is found in a unit and reported during the Warranty Period,* Case will pay parts and labor costs to repair the defect, if the services are performed by an authorized Case dealer at the dealer's location. [Emphasis supplied].

The warranty period stated in the Case Warranty began "at the time that any person, dealer or agent first places the unit into service" and ended "when either the month or machine hour limit is reached, whichever limit occurs first." The warranty period for the Loader's engine lasted 24 months or until the engine reached 2,000 machine hours, whichever occurred first. The warranty period for components, other than the engine, was one year after the date the Loader was placed into service.

The Case Warranty also states, in relevant part:

**No Modification or Extension of Warranty**

The Case Warranty is limited to the written terms in this pamphlet. Case *does not authorize any person, dealer or agent to change or extend* the terms of this warranty in any manner. *Any assistance to the purchaser in the repair or operation of any Case product outside the terms or limitations or exclusions of this warranty will not constitute a waiver of the terms, limitations or exclusions of this warranty, nor will such assistance extend or re-establish the warranty*. [Emphasis supplied].

The Case Warranty included the following disclaimer:

**THIS DOCUMENT CONTAINS THE ENTIRE CASE WARRANTY. CASE MAKES NO OTHER REPRESENTATIONS OR WARRANTIES EXPRESSED OR IMPLIED AND SPECIFICALLY EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE**. [Emphasis in original]

When Appellant purchased the Loader from Briggs, the Loader had already accrued 887 machine hours. Before completing the purchase, Appellant's owner Joseph Briley, Jr. ("Briley) took the Loader for a test drive. During the test drive, Briley mentioned to Briggs' salesman that the Loader exhibited a significant vibration. Briley did not think the vibration was significant enough to preclude his purchase.

When purchasing the Loader, JOC also purchased a 3-year/3,000 hour extended warranty plan, referred to as a "Purchased Protection Plan," ("PPP")

through Briggs' dealership. The PPP was issued by EPG Insurance, Inc. ("EPG"). According to the affidavit of Mark T. Heman ("Heman"), a product support manager for Case, "PPPs are sold through the dealer and are generally designed to cover defects that arise after the manufacturer's warranty has expired[,]" and "[Case] is not a party to any PPP issued by EPG."

After JOC's purchase of the Loader, JOC and a sister company named Pea Creek Mine, LLC ("Pea Creek") began using the Loader for industrial tasks, including extracting sand, loading, and hauling lime and fertilizer. Pea Creek was also owned by JOC's owner, Briley. Over a five year period after purchase, JOC and Pea Creek amassed more than 7,000 machine hours on the Loader.

The first time JOC took the Loader to Briggs for servicing was on 8 June 2009. JOC reported that the Loader's battery would not hold a charge and the cables were not working. A warranty claim was submitted to Case, who paid the claim under the Case Warranty.

The next time JOC brought the Loader to Briggs for repairs was September 2010. The reported issue was a problem with the Loader's fuel coil. A warranty claim was not submitted to Case for this problem. Instead a claim was submitted to EPG by Briggs under the PPP. EPG paid the covered portion of this claim. At the time JOC brought the loader to Briggs for repair in September 2010, the Loader had accrued 2,508 hours.

In February 2011, JOC brought the Loader to East Carolina Equipment Company for repairs related to a bearing in the transmission which was causing "vibration in power train while traveling." A claim was submitted to EPG for the repairs and EPG paid the covered portion under the PPP.

In April 2011, Case received a warranty claim relating to the Loader's transmission. In October 2011, Case received another warranty claim relating to the Loader's instrumentation. The Case Warranty had long expired by accrued hours and passage of time when both of these claims were filed. According to Heman's affidavit, for the April 2011 claim, Case paid $6,625.00 to JOC for a rental loader. For the October 2011 claim, Case paid $1,146.29 towards the repair costs. According to Heman, Case made these payments as gestures of goodwill to maintain clients and as "assistance to the purchaser in the repair or operation of any Case product outside the terms or limitations or exclusions of [the] warranty."

Sometime in 2011 or 2012, JOC contacted Case to request further financial assistance with an alleged vibration problem with the Loader. Case's product support manager, Jeffrey Schoch, met with JOC's representatives to discuss the issue. According to JOC's owner, Briley, Schoch told him that Case "would stand behind their product." JOC and Pea Creek continued to use the Loader.

On 20 February 2012, JOC filed a voluntary petition for bankruptcy protection under Bankruptcy Code Chapter 11 in the United States Bankruptcy Court for the

Eastern District of North Carolina. *See* 11 U.S.C. § 301. On 26 February 2013, the Bankruptcy Court approved JOC's proposed plan of reorganization. JOC did not list any potential legal claims against Case as an asset in its bankruptcy filings.

Sometime in September 2013, JOC brought the Loader to Hills Machinery Company, LLC ("Hills") for repairs. In May 2015, Hills filed suit against JOC, Pea Creek, and Briley, allegedly for the failure to pay a balance due of $34,708 allegedly owed for repairs to the Loader. JOC responded by filing counterclaims against Hills and asserting third-party claims against Case on 4 August 2015. JOC alleged that problems with the Loader were related to a vibration it asserted Case had undertaken to repair during the warranty period, but had failed to do. JOC asserted claims for breach of warranty, fraud, and unfair and deceptive trade practices against Case.

On 23 October 2017, Case filed a motion for summary judgment on JOC's claims pursuant to Rule 56(b) of the North Carolina Rules of Civil Procedure. On 26 October 2017, Pea Creek and JOC gave notice of five depositions to Hills and Case. Hills filed a motion for a protective order to reschedule the deposition of one of its witnesses due to a medical condition. Case filed an emergency motion for a protective order to prevent Pea Creek and JOC from proceeding with the depositions. The trial court heard Case's and Hills's motions for protective order, and ordered JOC to postpone one of the noticed depositions. The parties consented to JOC and Pea Creek proceeding with the other four depositions.

Following the completion of depositions by JOC and Pea Creek, Case filed a renewed motion for summary judgment. The trial court heard Case's summary judgment motion and granted summary judgment to Case on all of JOC's claims. JOC filed timely notice of appeal. JOC and Case are the only parties participating in this appeal.

## II. Jurisdiction

The trial court certified its interlocutory order, which granted summary judgment to Case on all of JOC's claims, as immediately appealable pursuant to Rule 54(b) of the North Carolina Rules of Civil Procedure. N.C. Gen. Stat. § 1A-1, Rule 54(b) (2017).

## III. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [a] party is entitled to judgment as a matter of law." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003) (citation and internal quotation marks omitted); *see* N.C. Gen. Stat. § 1A-1, Rule 56(c) (2017).

> A defendant may show entitlement to summary judgment by (1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense.

> Summary judgment is not appropriate where matters of credibility and determining the weight of the evidence exist.
>
> Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial. To hold otherwise . . . would be to allow plaintiffs to rest on their pleadings, effectively neutralizing the useful and efficient procedural tool of summary judgment.

*Draughon v. Harnett Cty. Bd. of Educ.*, 158 N.C. App. 208, 212, 580 S.E.2d 732, 735 (2003) (citations and quotation marks omitted), *aff'd per curiam*, 358 N.C. 131, 591 S.E.2d 521 (2004).

"The evidence produced by the parties is viewed in the light most favorable to the non-moving party." *Hardin v. KCS Int'l., Inc.*, 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009) (citation omitted). "Our standard of review of an appeal from summary judgment is *de novo*[.]" *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citations omitted).

## IV. Analysis

### A. *Breach of Warranty*

JOC argues genuine issues of material fact exist "regarding when JOC notified Case of the defects and whether Case's failures to repair the defects it was notified about during the shortest of the manufacturer's warranty periods asserted (one year)

tolls the statute of limitations (and thereby extends the warranty until the repairs are made)" to support its breach of warranty claim.

In response, Case contends it "has not relied on a statute of limitations defense, and JOC's arguments concerning tolling of the statute of limitations are misplaced."

JOC argues conduct by a warrantor which would toll the statute of limitations for a breach of warranty claim also extends the warranty period. JOC also implies that a warrantor receiving notice of a purported defect also extends the warranty period.

JOC cites two cases in support of its argument: *Haywood Street Redevelopment Corp. v. Peterson, Co.*, 120 N.C. App. 832, 463 S.E.2d 564 (1995), and *Stutts v. Green Ford, Inc.*, 47 N.C. App. 503, 267 S.E.2d 919 (1980).

In *Haywood*, this Court held a three-year statute of limitations for a breach of warranty claim was tolled during the time the defendant attempted to repair a waterproofing treatment it had applied to the plaintiff's parking deck to bring it into conformity with the warranty during the warranty period. 120 N.C. App. at 838, 463 S.E.2d at 567. This Court stated: "A statute of limitations is tolled during the time the seller endeavors to make repairs to enable the product to comply with a warranty." *Id.* (citations omitted).

In *Stutts*, the plaintiff sought repairs on his Ford truck purchased from the dealership. 47 N.C. App. at 509, 267 S.E.2d at 923. Ford Motor Company and the

dealership had jointly warranted "(a)ny part [found to be defective in factory material or workmanship] during the first 12 months or 12,000 miles of operation, whichever is earliest (except tire and diesel engines manufactured by others than Ford . . .)." *Id.* at 512, 267 S.E.2d at 924 (brackets in original). The plaintiff returned the truck to the dealership to repair an oil leak during the warranty period. *Id.*

After the dealership repeatedly fail to fix the oil leak, the plaintiff took the truck to another Ford dealership. *Id.* at 513, 267 S.E.2d at 925. At the end of the warranty period, the truck continued to leak oil despite several attempts by the selling Ford dealership and the other Ford dealership to fix the leak. *Id.*

The plaintiff filed claims, in part, against the dealership from which he had bought the truck and against Ford, the manufacturer, for breach of warranty. *Id.* at 507, 267 S.E.2d at 922. The dealership and Ford filed motions for directed verdicts, which the trial court granted. *Id.* at 507-08, 267 S.E.2d at 922. On appeal, the plaintiff argued the trial court erred in granting the defendants' motions for directed verdicts. *Id.* In response, the defendants argued:

> [The dealership] contends that plaintiff has failed to meet his burden of showing that [the dealership] failed to repair and replace parts found to be defective as required by the warranty and, further, that plaintiff's refusal to permit [defendant] to perform any further work on the truck after 26 October 1976 relieved it of any liability under the warranty. Likewise, defendant Ford Motor Company contends that its warranty obligation was satisfied when either [the selling dealership] or [the other dealership] replaced defective parts called to their attention.

*Id.* at 511, 267 S.E.2d at 924.

This Court stated:

> Although limited warranties are valid, compliance with their covenants to repair and to replace defective parts requires that the warrantor do more than make good faith attempts to repair defects when requested to do so. A manufacturer or other warrantor may be liable for breach of warranty when it repeatedly fails within a reasonable time to correct a defect as promised. A party seeking to recover for breach of a limited warranty is not required to give the warrantor unlimited opportunities to attempt to bring the item into compliance with the warranty.

*Id.* at 511-12, 267 S.E.2d at 924.

This Court rejected the dealership and Ford's arguments, reasoning:

> [T]here is sufficient evidence presented in the record from which the jury could infer that [the dealership] either refused to perform further repairs on plaintiff's truck, or that it failed to make proper repair of defective parts on the truck within a reasonable time, thereby causing plaintiff to seek repairs from another Ford dealer. In either event, both defendants' liability for breach would attach, and the plaintiff's refusal to return the vehicle to the selling dealer for further repairs would not preclude him from recovery.

*Id.* at 513, 267 S.E.2d at 925.

This Court reversed the trial court's grant of the defendants' motions for directed verdicts and remanded for a new trial. *Id.* at 514, 267 S.E.2d at 925.

*Stutts* and *Haywood* do not address the rule for which JOC purports to cite them. Neither case held that conduct by a warrantor, which may toll the statute of

limitations on a breach of warranty claim, also extends the warranty period. *See id*; *Haywood*, 120 N.C. App. at 838, 463 S.E.2d at 567.  Neither of these cases hold that a warrantor's notice of a defect extends the warranty period until the defect is repaired.  After extensive review of the case law, we have found no cases which stand for the proposition JOC attempts to assert.

Presuming, *arguendo*, attempts by a warrantor to correct a defect or notice of a defect during the term of the warranty extends the warranty period, the evidence, viewed in the light most favorable to JOC, does not establish a genuine issue of material fact with respect to its breach of warranty claim.

The Case Warranty is a written express warranty. " 'An express warranty is an element in a sale contract and is contractual in nature.' " *Atlantic Coast Mech., Inc. v. Arcadis, Geraghty & Miller of N.C., Inc.*, 175 N.C. App. 339, 343, 623 S.E.2d 334, 338 (2006) (quoting *Perfecting Serv. Co. v. Product Development & Sales, Co.*, 261 N.C. 660, 668, 136 S.E.2d 56,62 (1964)).  As a contract being interpreted, the terms of an express warranty "are therefore construed in accordance with their plain meaning," *Coates v. Niblock Dev. Corp.*, 161 N.C. App. 515, 517, 558 S.E.2d 492, 494 (2003) (citations omitted).

The Case Warranty expressly states that the warranty period for the Loader began "at the time that any person, dealer or agent first places the unit into service" and ended "when either the month or machine hour limit is reached, whichever limit

occurs first." Service records for the Loader indisputably show it was placed into service beginning on 29 August 2008. Briley, the owner of JOC, acknowledged in his deposition he knew the Loader had been used by a company in Florida prior to JOC's purchase.

The plain language of the Case Warranty indicates the applicable warranty period for the Loader's engine lasted 24 months after the Loader was placed into service or until the engine reached 2,000 machine hours, whichever occurred first. The warranty period for components, other than the engine, was one year from the date the Loader was placed into service. Under its plain and unambiguous terms, the *latest* time the Case Warranty would cover any defects would have been 29 August 2010, or 24 months after the Loader was placed into service.

The Case Warranty plainly states that a repair is covered "[i]f a defect in material or workmanship is found in a unit and reported during the Warranty Period[.]"

Between 30 April 2009, when Briley purchased the Loader on JOC's behalf, and 29 August 2010, the latest time the Case Warranty was in force and valid, the Loader was never brought to Briggs nor any other Case dealer for repairs related to the vibration that JOC's claim is premised upon. The undisputed evidence presented by the parties shows the only claim submitted during the longest period the Case Warranty could have covered was for repairs to the Loader's battery and cables in

June 2009. Case paid for the costs for this claim, which JOC does not dispute. Case's records from June 2009 do not mention any vibration in the Loader. JOC has produced no evidence tending to indicate the problems with the battery and cables in June 2009 were related to or caused by the vibration issue.

JOC also contends it gave Case notice of the alleged vibration defect when Briley test drove the Loader with Briggs's sales representative, Billy Tedder, in April 2009. Briley test drove the Loader prior to purchase. Briley testified in his deposition he noticed a vibration in the Loader when he test drove it, but "[a]t the time [he] didn't think it was a problem." Briley mentioned to Tedder that the Loader "had a vibration in it." Briley further testified:

> [Briley]: Well, I – I figured a new model machine, didn't know it was a problem. But I did make Billy aware of it as we were driving it. Not, you know – not in the sense that – basically curious, asked Billy, it seems to have a shake compared to the other loaders we've had before, a vibration.
>
> Q. Did you do anything else to make sure the [L]oader worked before you bought it other than this test drive?
>
> [Briley]: No.
>
> Q. When you told Billy that the [L]oader seemed to have a vibration problem during the test drive, what did Billy say?
>
> [Briley]: Basically he stated that it had the remaining warranty on it and that if we want to purchase extended warranty through them, that it would cover it if there's an issue with it. But as far as he's concerned, he – really wasn't familiar with the bigger loaders, that he thought maybe all of them had that type of vibration in them.

Later in his deposition, Briley was asked, "Does JOC claim that [Case] knew the [L]oader was defective before it was sold?" Briley responded: "No. I can't say that. But they knew immediately afterwards it did."

JOC has produced no evidence showing what notice Case had of the vibration problem in between the time Briley purchased the Loader and the latest time the Case Warranty could have expired in August 2010. Briley admitted he did not think the vibration was a problem when he test drove the Loader and no evidence shows JOC brought the Loader to Briggs, nor any other authorized Case dealer, to investigate or repair the vibration during the Case Warranty period. JOC contends the comments Briley made during the pre-purchase test drive put Case on notice of the alleged defect, but Briley admitted in his own testimony that Case did not know the Loader was defective before it was sold.

Briley signed and acknowledged the terms of the Case Warranty when he purchased the Loader on JOC's behalf. Briley testified he understood "that in order to be covered by the manufacturer's [Case] warranty, a defect would have to be reported within the warranty period."

Based upon the plain language of the Case Warranty, the documentary exhibits, and Briley's deposition testimony, JOC is unable to establish a genuine issue of material fact exists with respect to its breach of warranty claim. JOC did not provide Case the notice of the alleged vibration defect during the warranty period, as

is required by the express terms of the Case Warranty. JOC's argument is overruled.

B. *Fraud and Unfair and Deceptive Trade Practices*

JOC also argues genuine issues of material fact exist with regards to its fraud and unfair and deceptive trade practices claims against Case. We disagree.

Unfair and deceptive trade practice ("UDTP") claims are governed by N.C. Gen. Stat. § 75-1.1. *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 87-88, 747 S.E.2d 220, 226 (2013). Under the statute, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a) (2017).

To prevail upon a UDTP claim, a plaintiff must establish the following elements: " '(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff.' "*Capital Res., LLC v. Chelda, Inc.*, 223 N.C. App. 227, 239, 735 S.E.2d 203, 212 (2012) (citation omitted) (alteration in original), *review dismissed, cert. denied*, __ N.C. __, 736 S.E.2d 191 (2013).

"A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). "To prove deception, while 'it is not necessary . . . to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, [a] plaintiff must,

nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception.' " *Capital Res.,* 223 N.C. App. at 239, 735 S.E.2d at 212 (citation omitted) (alterations in original).

"Where an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show actual reliance on the alleged misrepresentation in order to establish that the alleged misrepresentation proximately caused the injury of which plaintiff complains." *Tucker v. Blvd. At Piper Glen, LLC*, 150 N.C. App. 150, 154, 564 S.E.2d 248, 251 (2002) (citation and quotation marks omitted).

With respect to a fraud claim, a plaintiff must establish the following elements:

> (1) that the defendant made a representation of a material past or present fact; (2) that the representation was false; (3) that it was made by the defendant with knowledge that it was false or made recklessly without regard to its truth; (4) that the defendant intended that the plaintiff rely on the representation; (5) that the plaintiff did reasonably rely on it; and (6) injury.

*Braun v. Glade Valley Sch., Inc.*, 77 N.C. App. 83, 87, 334 S.E.2d 404, 407 (1985) (citing *Johnson v. Phoenix Mutual Life Ins. Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980)).

"[A] mere promissory representation will not support an action for fraud." *Id.* "However, a promissory misrepresentation may constitute actual fraud if the

misrepresentation is made with intent to deceive and with no intent to comply with the stated promise or representation." *Id*. (citations omitted).

In support of its UDTP and fraud arguments, JOC asserts: "Case acknowledged repeatedly by word and deed that the Loader had yet to be repaired to address JOC's very first vibration complaints while at the same time telling Mr. Briley to go ahead and run the Loader. JOC, Pea Creek and Mr. Briley relied on those words and deeds to their detriment."

In its complaint, JOC alleges UDTP and fraud against Case based upon "fraudulent misrepresentations." Briley testified that "roughly three years after JOC purchased the Loader," he met with Jeffrey Schoch, a product support manager with Case, to discuss the vibration issue with the Loader. If the meeting occurred three years after JOC had purchased the Loader, it would have occurred outside the maximum time period the Case Warranty could have covered any defects. Briley testified that, at this meeting, Schoch told him Case "stand[s] behind their product and they were going to have [the Loader] fixed."

Case concedes in its brief that "for the purposes of summary judgment, Case does not dispute that the statement was made." Briley acknowledged JOC was not relying on any statements other than "we stand behind our product to support its fraud claim[.]"

Viewed in the light most favorable to JOC, no evidence establishes a genuine issue of fact with respect to JOC's fraud claim. Even if Schoch's statements that Case "stands behind their product and they were going to have it fixed" is construed as a promise that Case would fix the Loader, this is a promise of future performance. The Supreme Court of North Carolina has long recognized: "It is generally held, and is the law in this State, that mere unfulfilled promises cannot be made the basis for an action of fraud." *Williams v. Williams*, 220 N.C. 806, 810, 18 S.E.2d 364, 366 (1942). "Mere proof of nonperformance is not sufficient to establish the necessary fraudulent intent." *Id.* at 811, 18 S.E.2d at 367. This Court has stated: "The general rule is that an unfulfilled promise cannot be the basis for an action for fraud unless the promise is made with no intention to carry it out." *Northwestern Bank v. Rash*, 74 N.C. App. 101, 105, 327 S.E.2d 302, 305 (1985) (citation omitted).

JOC failed to forecast any evidence to show Case lacked the intent to fix the Loader at the time Schoch made the statement in question in 2011. Case submitted the affidavit of one of its product support managers, Heman, in support of its motion for summary judgment. Included as an exhibit to Heman's affidavit, is a copy of Case's "internal database called ASIST [which is used] to track any repairs for which a dealer requests assistance." The ASIST records show instances from 2013 and 2014 where Case employees provided advice to Hills's mechanics on how to fix the Loader's front axle and differential.

To the extent JOC purportedly argues Schoch's representations in 2011 somehow renewed or extended the Case Warranty, such a situation is expressly disclaimed by the Case Warranty, which states:

> Case does not authorize any person, dealer or agent to change or extend the terms of this warranty in any manner. Any assistance to the purchaser in the repair or operation of any Case product outside the terms or limitations or exclusions of this warranty will not constitute a waiver of the terms, limitations or exclusions of this warranty, nor will such assistance extend or re-establish the warranty.

Upon review of the evidence in the record, no genuine issue of material fact exists with respect to JOC's fraud claim against Case. *See Supplee v. Miller-Motte Bus. C., Inc.*, 239 N.C. App. 208, 229, 768 S.E.2d 582, 598 (2015) (affirming trial court's grant of summary judgment where plaintiff "failed to present specific evidence that . . . defendants had no intention of carrying out its unfulfilled promise; an essential element for a successful fraud claim.").

With respect to JOC's UDTP claim, the evidence of Schoch's statement that Case "stands behind its product," and promised to fix the vibration in the Loader, when viewed most favorably to JOC, shows, at most, a broken promise. A broken promise, standing alone, is not enough to establish a UDTP claim, unless the evidence shows the promisor "intended to break its promise at the time that it made the promise." *Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 196, 767 S.E.2d 374,

378 (2014); *see Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 451-52, 279 S.E.2d 1, 6 (1981).

In *Overstreet,* the defendant promised to the plaintiff that no part of a subdivision would be used for non-residential purposes. *Overstreet*, 52 N.C. App. at 451-52, 279 S.E.2d at 6. A year later, the defendant sold a subdivision lot to a buyer who it knew would use the lot for non-residential purposes. *Id.* On review of the trial court's grant of a motion for directed verdict to the defendant, this Court held that no evidence indicated that the defendant intended to break its promise at the time defendant made the promise and plaintiff had failed to establish a UDTP claim. *Id.* at 452-53, 279 S.E.2d at 6-7.

JOC has produced no evidence to indicate Case did not intend to fix the Loader at the time Schoch made the unauthorized representation to Briley in 2011. *Wells Fargo*, 238 N.C. App. at 196-97, 767 S.E.2d at 378. Schoch's representation is contrary to the express terms of the "No Modification or Extension of Warranty" provision in the Case Warranty, which prohibits "any person, dealer or agent to change or extend the terms of [the] warranty in any manner." The ASIST system records show Case continued to provide information and advice to Hills's mechanics on how to repair the Loader after Briley had met with Schoch in 2011. No genuine issue of material fact exists to support JOC's UDTP claim. JOC's arguments are overruled.

## C. *Judicial Estoppel*

Case argues the equitable defense of judicial estoppel as an alternative and independent basis to support summary judgment. Case argued the equitable defense of judicial estoppel as one of the bases for its motion for summary judgment before the trial court. Based upon our holding to affirm the trial court's order on the grounds that there are no genuine issues of material fact with respect to any of JOC's claims, it is unnecessary and we decline to address Case's judicial estoppel argument.

## V. Conclusion

Viewed in the light most favorable to JOC, no genuine issues of material fact exist with respect to JOC's claims for breach of warranty, fraud, and UDTP. The trial court correctly ruled Case was entitled to summary judgment as a matter of law. *See Summey*, 357 N.C. at 496, 586 S.E.2d at 249; *Draughon*, 158 N.C. App. at 212, 580 S.E.2d at 735. The trial court's order, which granted summary judgment to Case, is affirmed. *It is so ordered.*

AFFIRMED.

Judges DIETZ and HAMPSON concur.