IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-27

No. COA20-698

Filed 18 January 2022

Mecklenburg County, No. 18 CVD 20536

DAN KING PLUMBING HEATING & AIR CONDITIONING, LLC, Plaintiff,

v.

AVONZO HARRISON, Defendant.

Appeal by Defendant from judgment entered on 12 March 2020 by Judge Paulina Havelka in Mecklenburg County District Court. Plaintiff filed a cross-appeal. Heard in the Court of Appeals 25 May 2021.

*Hull & Chandler, P.A., by A. Joseph Volta, for Plaintiff-Appellee/Cross-Appellant.*

*Redding Jones, PLLC, by Joseph R. Pellington, Corey Parton, and Joseph H. Powell, for Defendant-Appellant.*

JACKSON, Judge.

¶ 1          This case presents a number of issues stemming from a contractual dispute between homeowner Avonzo Harrison ("Defendant") and the company that installed his HVAC system, Dan King Plumbing Heating and Air Conditioning ("the Company"). The action began when the Company filed suit against Defendant for money owed on the contract, and in response Defendant filed counter-claims against the Company for breach of contract and unfair and deceptive trade practices

("UDTP"). Following a jury trial, the Company was found liable for breach of contract, but the trial court dismissed Defendant's UDTP claim.

¶ 2    In his appeal, Defendant argues that the trial court erred in (1) ruling that the Company's actions did not constitute UDTP; and (2) not allowing him to amend his counterclaim to add a new debt collections UDTP claim. In its cross-appeal, the Company contends that the trial court erred in (1) denying the Company's motion for directed verdict on the breach of contract claim; (2) refusing to consider the Company's claim for attorneys' fees; and (3) denying the Company its right to make a final closing argument. We affirm in full the trial court's rulings as to the amendment of the counterclaim and the ordering of closing arguments. Because we hold that the trial court erred, in part, with regard to its evaluation of Defendant's UDTP claims and the Company's motion for directed verdict, we affirm in part, reverse in part, and remand on these issues.

## I.    Factual and Procedural Background

¶ 3    This case arises from a dispute between Defendant and the Company regarding plumbing, heating, and air conditioning services that the Company provided to Defendant in 2017—2018. Defendant is the owner of a home located on Symphony Woods Drive in Charlotte, North Carolina. Defendant decided to have a number of renovations done to the plumbing and HVAC systems in the home, and hired the Company for the task. On 25 October 2017, an employee of the Company,

Adam Whal, visited Defendant's home to provide estimates for the work—which included new water heaters, a new HVAC system, a water filtration system, and extensive piping replacement. Defendant was charged $227.37 for the initial site visit and inspection.

¶ 4 On 1 November 2017, Defendant went to the Company's office in-person to meet with Paul Stefano, the general manager, and Ernie Rodriguez, the sales manager. The managers outlined options and prepared written quotes for the plumbing and HVAC work to be performed on Defendant's home. After performing some independent research, Defendant returned to the office the following day and ultimately signed two separate contracts: a $16,324 contract for the plumbing work, and a separate $17,076 contract for the HVAC work. The work and warranties included, among other items not relevant to this appeal:

**(1) Plumbing**

    **a.** Installing a whole-house water filtration system.

        **i.** 10-year parts, 5-year media, and 2-year labor warranty.

    **b.** Installing a tankless hot water heater and heat exchanger.

        **i.** 5-year parts and 5-year labor warranty, and 5-years of required maintenance.

    **c.** Replacement of all polybutylene piping with PEX piping "within reason," not to include drywall repair.

        **i.** 2-year guarantee, including parts and labor.

**(2) HVAC**

    **a.** Removing, replacing, and installing a 2-ton HVAC system upstairs and a 5-ton HVAC system downstairs.

        **i.** 12-year parts and labor warranty, and 1-year of maintenance.

    **b.** Insulating the attic.

¶ 5    Following the finalization of the contract on 2 November 2017, the Company began performing plumbing work in the home in early November 2017.[1] The Company obtained a permit for the plumbing work, and the plumbing work was completed and ultimately passed its final inspection on 4 December 2017.

¶ 6    During the time that the Company was performing the plumbing work, Defendant was engaged in several other on-site home renovation projects, such as removing the old bathroom vanities and installing new ones, and removing the old kitchen cabinets and installing new ones. Defendant brought in outside workers from Habitat for Humanity to assist in this work.

¶ 7    Sometime during this period, the Company ran into unanticipated difficulties in installing the tankless water heaters that were specified in the contract. Two employees of the Company, Tommy Rea and Adam Whal, spoke with Defendant, and

---

[1] During the time period that the plumbing and HVAC work was being performed, Defendant was not residing at the property and the property was unoccupied.

recommended that they install traditional tank-based water heaters instead. Defendant agreed, and the parties then entered into a modified oral agreement for the water heaters.

¶ 8        The modified agreement was memorialized in a written document, dated 7 November 2017, which specified that the filtration system and re-piping work would remain the same, but the tankless water heater would be replaced with two 50-gallon, tank-based water heaters. The modified written agreement was $437 more than the original plumbing contract, and did not mention any warranties.

¶ 9        Defendant, however, denies having ever seen or signed the 7 November written agreement. He asserts that the discussion surrounding the tank-based water heaters was only an oral agreement, and was never presented with a new written contract for the plumbing work. He believes that his signature was forged on the 7 November document.

¶ 10        On the 7 November written agreement, there appears to be a second signature visible underneath Defendant's. The Company asserts that Chad Cockerill, the employee who filled out and signed the 7 November written agreement, accidentally signed the agreement in the wrong place and used white-out to correct the mistake, and that Defendant then signed on top of Chad's whited-out signature. Adam Whal maintains that he witnessed Defendant signing the new contract over the whited-out portion. At trial, the jury agreed with Defendant and found that the Company

"superimpose[d] Mr. Harrison's signature onto a document Mr. Harrison did not sign."

¶ 11    Adam Whal returned to Defendant's home on 8 November 2017 to conduct a final inspection and test of the completed plumbing work. The inspection revealed that all plumbing was functional; however, a 40-gallon tank heater had been installed upstairs and a 50-gallon tank heater had been installed downstairs—despite the fact that the amended agreement specified two 50-gallon heaters.

¶ 12    The Company also began work on the HVAC system during the first week of November 2017. The Company obtained a permit for the HVAC work on 3 November 2017, and on this date the Company also completed an "Installation Excellence Checklist" regarding the HVAC work. The Checklist included a list of approximately 50 tasks related to the HVAC work on the home, and indicated that all relevant HVAC tasks had been completed. However, according to the testimony of both Defendant and employees of the Company, the HVAC work had not, in fact, been completed as of 3 November 2017. Defendant asserts that none of the tasks were complete as of that date, while the Company maintains that some of the tasks were completed as of that date. It is unclear from the record when the HVAC work was actually completed, though it was completed at least by February 2018 when it passed inspection.

¶ 13    On 19 November 2017, Defendant emailed Paul Stefano a "punch list" listing

several uncompleted plumbing and HVAC tasks, and expressing concern over the completeness of the re-piping work and the professionalism exhibited by the Company. On 30 November 2017, the Company returned to Defendant's residence to conduct a final walkthrough of the plumping work, prior to inspection. The plumbing work passed County inspection on 4 December 2017. In February of 2018, the HVAC work passed County inspection. The Company visited Defendant's residence several more times between 18 December 2017 and 3 July 2018 to complete various miscellaneous items the parties had contracted for, including the attic insulation.

¶ 14     On several occasions during 2018, Defendant hired or requested quotes from third-party contractors to complete or remediate some of the work performed by the Company, such as replacing one of the water heaters that had begun to leak. He chose to use third-parties, rather than contract any further with the Company or make a claim under the warranty, because their relationship had deteriorated and he did not trust the quality of their work. Defendant also personally registered the manufacturers' warranties for the equipment purchased through the Company, contrary to his expectations.

¶ 15     When it came time to make payments, under the original two 2 November contracts, Defendant owed the Company $33,400. Under the 7 November amended contract, the amount due was slightly higher, $33,702.97. Defendant paid $30,000 of the amount due on 15 November 2017, via funds obtained from a third-party creditor.

The Company calculated Defendant's outstanding balance as the remaining $3,702.92, less a $227 difference crediting the cost of the 25 October visit to Defendant's account, as the parties had agreed to. This amount was not paid by Defendant.

¶ 16 On 18 August 2018, the Company commenced a small claims action against Defendant in Mecklenburg County, requesting money owed for contractual services rendered. The magistrate dismissed the action with prejudice on 17 October 2018, finding that the Company had failed to prove the case by the greater weight of the evidence. The Company timely filed a notice of appeal to the District Court on 25 October 2018.

¶ 17 On 14 November 2018, Defendant filed an answer denying all allegations in the complaint, and also filed a counterclaim against the Company, alleging various misrepresentations and contractual breaches. The Company replied, denied all of Defendant's allegations, and moved to dismiss the countersuit on 17 December 2018. On 20 February 2019, Defendant moved to file an amended counterclaim. The District Court granted Defendant's motion to amend on 29 March 2019. In his amended counterclaim, Defendant added claims for breach of contract, unfair and deceptive trade practices, fraud, and breach of the implied warranty of workmanship. The Company answered the amended counterclaim on 29 July 2019, substantially denying all allegations and raising a number of affirmative defenses.

¶ 18　　On 3 September 2019, the Company moved for summary judgment and attorneys' fees. On 20 December 2019, a summary judgment hearing was held before the Honorable Kimberley Y. Best. During this hearing, Defendant voluntarily dismissed the fraud counterclaim. On 7 January 2020, the trial court issued an order granting in part and denying in part the Company's motion for summary judgment. The court awarded summary judgment to the Company with respect to one aspect of Defendant's UDTP claim—namely, his claim that the Company had "[generated] the altered invoice reflecting a 4-ton unit versus a 5-ton unit"—but the court denied summary judgment with respect to the remainder of the parties' claims and counterclaims.

¶ 19　　A jury trial was held beginning on 18 February 2020, presided over by the Honorable Paulina Havelka. During trial, the court rejected a motion by Defendant to amend his counterclaim to include a UDTP claim for unfair debt collection practices by the Company, ruling that Defendant had not raised the issue properly prior to trial.

¶ 20　　The trial concluded on 24 February 2020, and the jury returned a verdict in favor of Defendant on all breach of contract claims and findings of fact concerning the UDTP claims. The jury awarded Defendant damages in the amount of $15,572 for the breach of contract and $15,000 for injuries associated with the UDTP claims.

¶ 21　　On 26 February 2020, an additional hearing was held before Judge Havelka,

in order to determine whether the facts found by the jury amounted to UDTP as a matter of law. The court ultimately ruled that none of the jury's findings amounted to unfair or deceptive trade practices, and dismissed all remaining claims with prejudice. Before the hearing adjourned, the parties also discussed the possibility of scheduling a further post-trial hearing to determine potential awards of attorneys' fees, but the fee hearing never occurred.

¶ 22 On 11 March 2020, the Company filed a motion requesting to set aside the jury's verdict, and requesting to be heard on attorneys' fees. Later that same day, the trial court entered its written judgment in favor of Defendant, awarding him damages of $15,572 plus interest on the breach of contract claims, in accord with the jury's verdict. The judgment noted that none of the jury's findings amounted to unfair or deceptive trade practices, and dismissed all of the parties' remaining claims with prejudice.

¶ 23 On 3 April 2020 and 8 April 2020, the Company and Defendant, respectively, noticed appeal from the trial court's judgment.

## II. Analysis

¶ 24 We first address Defendant's appeal, and then proceed to discuss the Company's appeal.

### A. Whether the Jury's Findings Amounted to UDTP

¶ 25 Defendant first contends that the trial court erred by ruling that the jury's

findings of fact did not, as a matter of law, amount to unfair and deceptive trade practices. We agree with respect to the duplicate warranties claim, but disagree with respect to the forged signature and installation checklist claims. We accordingly affirm in part and remand in part.

¶ 26    Under North Carolina law, a consumer may bring a private cause of action against businesses who engage in unfair and deceptive trade practices. *See* N.C. Gen. Stat. § 75-1.1 (2019). The statute is intended to "provide consumers with a remedy for injuries done to them by dishonest and unscrupulous business practices." *Hester v. Hubert Vester Ford, Inc.*, 239 N.C. App. 22, 30, 767 S.E.2d 129, 136 (2015).

¶ 27    "In order to establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Gray v. N. Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). Ordinarily, in a UDTP case, the jury will determine the facts of the case, and the trial court, "based on the jury's findings, then determines, as a matter of law, whether the defendant engaged in unfair or deceptive practices in or affecting commerce." *Id.* This Court reviews the trial court's conclusions of law on unfair or deceptive trade practices *de novo*. *See Terry's Floor Fashions, Inc. v. Crown Gen. Contractors, Inc.*, 184 N.C. App. 1, 21, 645 S.E.2d 810, 823 (2007).

¶ 28    This case requires us to examine two corollary doctrines under our UDTP

caselaw—the "aggravating circumstances" doctrine, and the "reliance" doctrine. The first doctrine comes into play when a plaintiff's UDTP claim is centered around the defendant's breach of a contract. Our courts have long held that a mere breach of contract, standing alone, is not sufficient to maintain a UDTP claim. *See, e.g.*, *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992) ("[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1.").

¶ 29 When a plaintiff alleges a UDTP violation based upon a breach of contract, the plaintiff "must show substantial aggravating circumstances attending the breach to recover under the Act[.]" *Id.* (internal marks and citation omitted). Tortious conduct must be shown. "Fraud or deception" can constitute aggravating circumstances, when it rises to the level of a practice that is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 230-31, 768 S.E.2d 582, 598-99 (2015).

¶ 30 The second doctrine—the reliance doctrine—holds that in order to satisfy proximate cause, a plaintiff must demonstrate that they detrimentally relied on the defendant's alleged misrepresentation or deception in order to recover under the statute. *See DC Custom Freight, LLC v. Tammy A. Ross & Assocs., Inc.*, 273 N.C. App. 220, 233, 848 S.E.2d 552, 562 (2020); *Pearce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 471, 343 S.E.2d 174, 180 (1986). Reliance, in turn, is comprised of two

factors—actual reliance and reasonableness. *Bumpers v. Cmty. Bank of N. Virginia*, 367 N.C. 81, 89, 747 S.E.2d 220, 227 (2013). The first element—actual reliance—requires a showing that "the plaintiff [] affirmatively incorporated the alleged misrepresentation into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether." *Id.* at 90, 747 S.E.2d at 227. In other words, the plaintiff must have "acted or refrained from acting in a certain manner due to the defendant's representations." *Williams v. United Cmty. Bank*, 218 N.C. App. 361, 368, 724 S.E.2d 543, 549 (2012 (internal marks and citation omitted). The second element—reasonableness—requires a showing that the plaintiff's reliance on the defendant's "allegedly false representations [was] reasonable." *Bumpers,* 367 N.C. at 90, 747 S.E.2d at 227. A plaintiff's reliance is not reasonable when "the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Id.*

¶ 31        Here, Defendant contends that the Company committed UDTP in three respects: (1) by superimposing Mr. Harrison's signature on the amended contract; (2) by selling him duplicate warranties; and (3) by misrepresenting the completeness of the work via the installation checklist. The Company, in response, argues that Defendant has no UDTP claim because is unable to show that he detrimentally relied on any purported misrepresentation by the Company, and because he is unable to show that the Company's conduct rose to the level of aggravating circumstances.

¶ 32    With respect to the superimposition of the signature, we affirm, as Defendant cannot show actual reliance. With respect to the installation checklist, we also affirm, as Defendant cannot show injury. However, with respect to the asserted fraud in duplicate warranties, we remand for further fact-finding regarding the reasonableness of Defendant's reliance.

### 1. *Superimposition of Defendant's Signature*

¶ 33    Defendant first argues that the Company committed UDTP by superimposing his signature on 7 November contract. To review, Defendant and the Company entered into a contract for the plumbing work on his home on 2 November 2017. Several days later, after the Company had begun work on the project, unanticipated difficulties arose with the installation of the tankless water heater. So, Defendant and the Company reached an oral agreement to install two 50-gallon, tank-based water heaters in place of the tankless water heater. The Company then created a new written contract on 7 November 2017, which contained two key differences—a $437 difference in the contractual cost, and a provision for the installation of two 50-gallon, tank-based heaters. However, Defendant testified that he was never presented with the 7 November contract (at least until after this litigation began), and maintains that his signature on the contract was forged. The jury sided with Defendant and found that his signature had been superimposed on the 7 November contract.

¶ 34     We must now address whether these actions amounted to UDTP, above and beyond a mere breach of contract. The first element of a UDTP claim requires proof that the business engaged in "an unfair or deceptive trade practice." A practice is deceptive when "it has the capacity or tendency to deceive." *Walker v. Fleetwood Homes of N. Carolina, Inc.*, 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007). The act of signing someone else's name to a document without their authorization constitutes an act with the capacity to deceive, thus satisfying the first element. The second element of a UDTP claim requires proof that the conduct was "in or affecting commerce," and both parties here agree that a contract for plumbing services satisfies this element.

¶ 35     The third element of a UDTP claim requires proof that the unfair or deceptive acts "proximately caused injury" to the plaintiff. As explained above, our courts have interpreted this proximate cause element as requiring proof of detrimental reliance by the plaintiff—reliance which causes injury, and which is both actual and reasonable. As for actual reliance, Defendant here must show that he incorporated the Company's misrepresentation into his decision-making process, or that he "acted or refrained from acting in a certain manner" due to the Company's deceptive acts. *Williams,* 218 N.C. App. at 368, 724 S.E.2d at 549. As for reasonable reliance, Defendant must show that his reliance on the company's deceptive acts was reasonable. Both of these inquiries require "examin[ing] the mental state of the

plaintiff." *Bumpers*, 367 N.C. at 89, 747 S.E.2d at 227.

¶ 36    The Company argues that Defendant cannot show actual reliance because, according to his own admission, Defendant "never saw the 7 November Plumbing Contract until approximately twelve to fourteen months after he initially met with [the Company]." Accordingly, because Defendant never received the allegedly forged contract until long after the work was completed, he could not have relied upon its contents to his detriment—i.e., he could not have relied upon a document that he did not know existed.

¶ 37    Defendant, in contrast, appears to argue that he detrimentally relied upon the price and terms that the Company provided to him in the *original* contract—and that the damage he suffered was reflected in the increased price of the second (forged) contract, and the installation of different equipment than he had originally contracted for.

¶ 38    We agree with the Company that this set of facts does not ultimately amount to UDTP. Even if we accept as fact that the Company forged the second contract, Defendant still cannot show that he actually relied on this misrepresentation by the company. A helpful precedent here is *Fazzari v. Infinity Partners, LLC*, 235 N.C. App. 233, 762 S.E.2d 237 (2014). In that case, a planned subdivision development failed after the properties were significantly over-appraised in representations made to lenders. *Id*. at 234-36, 762 S.E.2d at 238-39. The plaintiffs (who had all purchased

lots in the planned subdivision) brought suit against the developers for UDTP, claiming that they relied on misrepresentations by the developer and appraisers "in making their decisions to take out the loans on which they later defaulted." *Id.* at 244, 762 S.E.2d at 244. On appeal, we held that the trial court had properly denied summary judgment to the plaintiff purchasers, as they were unable to demonstrate they actually relied on the deceptive appraisals. *Id.* at 243, 762 S.E.2d at 243.

¶ 39    We noted that the plaintiffs had testified that the developer "did not make any misrepresentations to them in regard to their loans[,]" apart from stating that the development project "should do well" and was "the real deal." *Id.* at 244, 762 S.E.2d at 244 (internal marks omitted). More importantly, even if these puffering or noncommittal statements "could be construed as factual misrepresentations," these remarks were not made until *after* the plaintiffs had already purchased their lots—and so the plaintiffs could not have relied on these statements. *Id.*

¶ 40    Likewise, with regard to the over-appraisal of the lots, we similarly concluded that no actual reliance was shown. *See id.* at 245, 762 S.E.2d at 244. We summed up the evidence as follows:

> the plaintiffs were purchasers of lots in [a] real estate investment scheme in which [the appraiser] appraised a large number of lots at an identical, inflated value to meet the loan-to-value conditions required to obtain bank loans. The scheme . . . involved contracts that promised repurchase of lots with a guaranteed profit for the investors. [However], the development was never

completed, and investors were left with large loans and lots
worth only a fraction of their appraised values.

*Id*. (internal marks and citations omitted).

¶ 41        Despite this unsavory behavior by the developers and appraisers, we nevertheless held that the plaintiffs could not show actual reliance because "[a]ll of the evidence show[ed] that the plaintiffs made their decisions to invest in the development and contracted to do so without any awareness of, much less reliance on, the appraisals." *Id*. This is because the misleading appraisals did not occur until *after* the plaintiffs had already signed their purchase contracts. *Id*. Thus, we concluded that the plaintiffs "cannot have relied on information they did not see and did not know existed (some of which did not, in fact, yet exist) at the time of their decisions." *Id*., 762 S.E.2d at 245. Accordingly, in light of the plaintiffs' "inability to show either misrepresentations [by the developers] or reliance on the allegedly negligent appraisals," we held that the trial court properly denied their UDTP claims. *Id*. at 246-47, 762 S.E.2d at 245.

¶ 42        Here, like the plaintiffs in *Fazzari,* Defendant likewise attempts to base his UDTP claim on a deceptive act of which he had no awareness at the time he made his contractual decision. Defendant testified that he did not learn of the existence of the 7 November contract (with the forged signature) until twelve to fourteen months after he had initially met with the Company—long after he signed the first contract, and

long after the work had been completed. Thus, as in *Fazzari,* we conclude that

Defendant could not have detrimentally relied on information which he did not know

existed at the time of his decision, and that Defendant cannot satisfy the actual

reliance element of his UDTP claim.[2] The trial court accordingly did not err in

concluding that the forged signature on the second contract did not constitute UDTP.

### 2. Sale of Duplicate Warranties

¶ 43      Defendant next argues that the Company committed UDTP by selling him

duplicate warranties for the plumbing and HVAC work—in essence, arguing that the

Company duplicitously sold him warranties that he automatically received from the

product manufacturer at the time of purchase. To review, as part of the 2 November

contract, the Company sold Defendant two relevant warranties: (1) a warranty for

the tankless water heater for "10 years parts, 5 years media, and 2 years labor," and

(2) a warranty for the HVAC equipment for "12 years parts & labor" and "one year

maintenance." However, evidence was presented at trial showing that the HVAC

equipment which Defendant purchased already came with an included 10-year parts

---

[2] Even if we were to accept Defendant's theory of the case—that the original 2 November contract was the source of the misrepresentation, in that he detrimentally relied upon the price and terms that the Company provided to him in this first contract—Defendant's UDTP claim still fails. As we have previously explained, "[a] broken promise, standing alone, is not enough to establish a UDTP claim, unless the evidence shows the promisor intended to break its promise at the time that it made the promise." *Hills Mach. Co., LLC v. Pea Creek Mine, LLC*, 265 N.C. App. 408, 421, 828 S.E.2d 709, 718 (2019) (internal marks and citation omitted). Here, Defendant has presented no evidence showing that, at the time of the 2 November contract, the Company intended to break its promise to install the tankless water heater or intended to deviate from the originally agreed-upon price.

warranty from the manufacturer.

¶ 44 During trial, Defendant testified that he was not informed about the existence of the manufacturer's warranty at the time of the 2 November contract, and that he was "unaware at that time that [the Company's] warranties ran concurrently with the manufacturer's warranty." Defendant maintained, that by including the manufacturer warranty as part of the purchase price, the Company had misrepresented what it was selling to him. The jury sided with Defendant, and concluded in its findings of fact that "Dan King [sold] Mr. Harrison duplicate warranties."

¶ 45 We now address whether these actions amounted to UDTP. The sale of duplicate warranties may constitute an act which has the tendency to deceive, and which occurs in or affecting commerce. It is the third element of UDTP that is in true contention here—i.e., whether or not Defendant suffered injury due to the Company's misrepresentations by detrimentally relying on any duplicity in the warranties.

¶ 46 We note that under this aspect of Defendant's UDTP claim, the aggravating circumstances doctrine is not triggered. As explained above, this doctrine holds that a "mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1"—thus, when a plaintiff's UDTP claim stems from a breach, the plaintiff must show aggravating circumstances in order to recover. *Thompson*, 107 N.C. App. at 62, 418 S.E.2d at 700. However, the duplicate

warranties claim here does not stem from a *breach* of contract by the Company—rather, it is based on the idea that selling a warranty while withholding information regarding the existence of other applicable warranties with potentially overlapping coverage constitutes an UDTP. This scenario is distinct from the traditional aggravating circumstances and breach analysis, because it does not center around any contractual obligation that the Company failed to perform.

¶ 47    Under the first element of reliance, Defendant must show that he actually relied on the misrepresentation—that, but for the Company's actions, he would have "acted or refrained from acting in a certain manner." *Williams,* 218 N.C. App. at 368, 724 S.E.2d at 549. Here, we conclude that this element is satisfied because the Company did not disclose or identify the fact that these products carried pre-included manufacturer warranties, and because Defendant testified that he would not have purchased the warranty from the Company had he known that the HVAC products already came with an included manufacturer warranty.

¶ 48    Under the second element of reliance, Defendant must show that his reliance on the Company's misrepresentation was reasonable. *Bumpers,* 367 N.C. at 90, 747 S.E.2d at 227. Reliance is not reasonable when "the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Id.*

¶ 49    The Company argues that Defendant's reliance on the warranties was not reasonable because he failed to perform due diligence before signing the contract.

The Company contends that Defendant should have researched the products that he was purchasing before he signed the contract, in which case he would have discovered that certain products had pre-included manufacturer's warranties. Moreover, the Company maintains that it is common knowledge that many HVAC products carry manufacturer's warranties.

¶ 50        Defendant, in response, argues that his reliance was reasonable because this was a transaction between a professional HVAC company and a layperson. Defendant contends that it would be unfair and irrational to hold that a consumer of HVAC or plumbing services must independently research every single product set to be installed in their home in order to determine whether the business they are contracting with might be selling them a duplicate warranty. Defendant contends that the existence of manufacturer warranties tied to certain HVAC parts is far from common knowledge, and that in this scenario he acted perfectly reasonably in relying on the Company's assurances regarding the warranties it sold.

¶ 51        In explaining the concept of "reasonable diligence," we have previously held that "a plaintiff cannot simply ignore facts which should be obvious to him or would be readily discoverable upon reasonable inquiry." *S.B. Simmons Landscaping & Excavating, Inc. v. Boggs*, 192 N.C. App. 155, 162, 665 S.E.2d 147, 151 (2008). On the other hand, we also think it true that a layperson consumer should not be held to the same standard of due diligence as a sophisticated commercial entity. *See DC*

*Custom Freight*, 273 N.C. App. at 233, 848 S.E.2d at 562 (holding that it was unreasonable for the plaintiff, "a sophisticated business" specializing in trucking, to simply assume, without investigation, that the trucks it rented from the defendant were covered under the defendant's insurance policy).

¶ 52        Here, we are unable to determine based on the record whether Defendant would have discovered the existence of the duplicate warranties through reasonable diligence at the time of the original contract, and we do not have the benefit of any jury findings on this issue. During trial, no evidence was presented regarding whether the existence of HVAC manufacturer warranties is considered "common knowledge" (especially to a layperson); no evidence was presented regarding how it was that Defendant ultimately came to discover the existence of the manufacturer warranties; and no evidence was presented regarding whether it was a common practice in the HVAC industry to sell parts warranties for products that were already covered by a manufacturer warranty.

¶ 53        It is relevant whether Plaintiff provided new, additional, or extended warranties beyond those provided by the manufacturer. For example, if the manufacturer's warranties were for parts only or limited to a stated time, and Plaintiff extended those times, added maintenance or repair of excluded items or provided labor, these would be separate and independent warranties beyond what the manufacturer provided and would not be duplicative. It is also relevant that

Plaintiff provided a warranty as a member of the local community resulting in Defendant obtaining a more ready source for the resolution of any problems. "Though the risk to [Plaintiff's] separate assets may have been slight, said risk is consideration." *Poythress v. Poythress*, 2021-NCCOA-589, ¶ 16 (citing *Young v. Johnston Cnty.*, 190 N.C. 52, 57, 128 S.E. 401, 403 (1925) ("The slightest consideration is sufficient to support the most onerous obligation; the inadequacy, as has been said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced.")). Accordingly, we remand for further fact-finding on the issue of Defendant's reasonable diligence in discovering the existence and coverage of the duplicate warranties.[3]

### *3. Installation Checklist*

¶ 54    Finally, Defendant argues that the Company committed UDTP by filling out an "Installation Excellence Checklist" indicating that it had completed all work on the project, when in fact much of that work had yet to be completed. To review, on 3 November 2017 an employee of the Company filled out and signed the checklist, which contains over three pages of specific plumbing and HVAC tasks related to the project. The Checklist contains the following representation: "I certify all of the items

---

[3] The Company also argues that Defendant's UDTP claims are barred by the economic loss rule. As the Company cites no relevant, binding precedent to show that the economic loss rule applies in the context of UDTP claims, we decline to address this argument.

that have been checked are either complete or not applicable to this work site." It is undisputed that the majority of the tasks listed on the Checklist had not been completed by 3 November 2017. In fact, 3 November 2017 was the day that the Company first obtained the work permits and began work on Defendant's home, and the evidence showed that it was unfeasible that a project of this scope could have been completed in a single day.

¶ 55          We now address whether these actions amounted to UDTP. As with the forged signature claim, it is clear that Defendant can easily satisfy the first two elements of UDTP. The creation of a construction checklist that falsely represents the status of the Company's work on the project is an act which has the tendency to deceive and that occurs in or affecting commerce. It is part of the third element of UDTP that is in contention—i.e., whether or not Defendant suffered injury due to this misrepresentation.

¶ 56          The Company contends that Defendant suffered no injury stemming from the checklist because the Company continued its work on the project for several more months after the checklist was created, and that the end result was a functional HVAC and plumbing system that passed state inspection. Defendant contends that he was injured because the checklist contained misrepresentations about the true circumstances and completeness of the project.

¶ 57          Here, we agree with the Company that Defendant has not produced sufficient

evidence that he was injured by the existence of this document. We have previously defined legal injury as "a wrongful act which causes loss or harm to another." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 384, 781 S.E.2d 889, 894 (2016) (citations omitted). Defendant has failed to produce any evidence of a harm or loss that he suffered as a result of this checklist—it caused him no monetary or economic injury, it did not cause any delay in the completion of the work, nor any lessening of the quality of the work. Moreover, it is not clear from the record when Defendant even discovered the existence of this checklist. As stated above, a person cannot detrimentally rely on a document he did not know existed. Accordingly, we conclude that Defendant cannot meet all elements of a UDTP claim and that the trial court did not err in ruling against him on this issue.

**B. Denial of the Motion to Amend**

¶ 58        Defendant next argues that the trial court erred by refusing to allow him to amend his counterclaim to introduce a collection notice that was sent to him as a result of the Company's debt collection practices, which he asserts amounted to UDTP. We disagree, and hold Defendant has failed to show the trial court abused its discretion in refusing to allow the amendment.

¶ 59        Following Defendant's failure to pay the remaining balance on the plumbing and HVAC contracts, the Company sent his bill to an outside collections company. The collections company sent Defendant a collection notice on 5 June 2019. However,

Defendant's amended counterclaim, which was filed on 29 March 2019, did not mention the collections notice as the basis of any potential claim. The Company then filed its motion for summary judgment on 3 September 2019. At the summary judgment hearing on 20 December 2019, Defendant argued (for the first time) that the issuance of the collection notice amounted to UDTP, and identified the collection notice as a potential trial exhibit.

During trial, Defendant attempted to introduce the collection notice. The Company objected to the introduction of the collection notice and any associated testimony, asserting that it had not received sufficient notice of this new claim. The trial court similarly expressed its concern that the collections issue had not been included in Defendant's pleadings. Ultimately the trial court's ruling precluded Defendant from introducing the collection notice or from discussing any collection attempts—reasoning that introducing this evidence this late into the litigation would amount to bringing a new claim, of which the Company did not receive proper notice.

Defendant had attempted to introduce this collections evidence because he believed it amounted to an additional unfair and deceptive act by the Company, which would bolster his UDTP claim. Under our General Statutes, a debt collector can be held liable for attempting to collect a debt by contacting the adverse party directly, when the collector knows that the adverse party is represented by counsel. *See* N.C. Gen. Stat. §§ 75-55(3), 58-70-115(3) (2019). Defendant argued that the Company

violated this law by having the collections agency contact him directly, when they knew he was represented by an attorney.

¶ 62    Regardless of the potential merit of Defendant's claims, we conclude that the trial court did not err in refusing to admit the collections evidence. We review the trial court's evidentiary rulings—including rulings on a motion to amend—for abuse of discretion. *Fintchre v. Duke Univ.*, 241 N.C. App. 232, 239, 773 S.E.2d 318, 323 (2015). An abuse of discretion is as a "ruling [] so arbitrary that it could not have been the result of a reasoned decision[.]" *Ferguson v. DDP Pharmacy, Inc.*, 174 N.C. App. 532, 535, 621 S.E.2d 323, 326 (2005) (internal marks and citation omitted).

¶ 63    Amendment of pleadings is governed by Rule 15 of the North Carolina Rules of Civil Procedure, which provides in pertinent part that "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served." N.C. Gen. Stat. §1A-1, Rule 15(a) (2019). However, after a party makes their amendment as a matter of course, further amendments are allowed "only by leave of court or by written consent of the adverse party." *Id*. Moreover,

> [i]f evidence is objected to at trial on the ground that it is not within the issues raised by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be served thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

*Id*., Rule 15(d).

¶ 64        In adjudicating a party's motion to amend, the trial court abuses its discretion when it "refuses to allow an amendment" without providing any "justifying reason for denying the motion to amend." *Ledford v. Ledford*, 49 N.C. App. 226, 233, 271 S.E.2d 393, 398 (1980).  In contrast, a trial court acts properly in denying a motion to amend for reasons of "(a) undue delay, (b) bad faith, (c) undue prejudice, (d) futility of amendment, and (e) repeated failure to cure defects by previous amendments." *Strickland v. Lawrence*, 176 N.C. App. 656, 666-67, 627 S.E.2d 301, 308 (2006) (internal marks and citation omitted).

¶ 65        When a trial court denies a party's motion to amend based on undue delay, "the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit." *Id.* at 667, 627 S.E.2d at 308.  For example, in *Strickland* we held that the trial court did not abuse its discretion in denying the plaintiffs' motion to amend to add a new claim, because of undue delay by the plaintiffs. *Id.*  We noted that the plaintiffs' motion "was filed seven months after the institution of their action," and that at that point discovery had almost entirely concluded. *Id.*  Similarly, in *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 679, 748 S.E.2d 154, 161 (2013), we held that the trial court did not abuse its discretion in denying the plaintiff's motion to amend to add three additional claims, because of both undue delay and prejudice.  We noted that the defendant had received no notice of the three additional claims, and that the motion to amend was made "thirteen

months after [the plaintiff] filed the initial complaint and only five days before the [summary judgment] hearing" was set to begin. *Id*.

¶ 66    In the present case, we likewise conclude that the trial court did not abuse its discretion in denying Defendant's motion to amend. During trial, the court engaged in extensive discussion with Defendant and the Company regarding the potential amendment of Defendant's pleadings to add the new collections claim. When Defendant asked whether a motion to amend would be permitted, the trial court responded "[n]ot in the middle of trial, no." When Defendant went on the argue that he could not have possibly included this claim in his original amended counterclaim because the collection notice was not sent until after the filing of the counterclaim, the court noted that it likely "would have allowed [Defendant] to amend the [counterclaim]" at an earlier date "since [Defendant] did not learn of [the collection notice] until after the discovery process," but that the court could not imagine allowing the amendment "midway after we started the trial."

¶ 67    The trial court's reasoning here is apt—while it is true that the collections notice was not sent until 5 June 2019, after Defendant's amended counterclaim had already been filed, this does not change the fact that Defendant was aware of the existence of the collections notice all throughout the summer and fall of 2019 but failed to take any action to add this claim to the litigation. The first occasion that Defendant brought this collections issue to the trial court's attention was at the

summary judgment hearing on 20 December 2019, and Defendant did not move to amend his pleadings to include this new claim until trial had already begun in February 2020. Thus, we conclude that the trial court did not abuse its discretion by denying Defendant's motion for leave to amend his complaint in the middle of trial.

## C. Directed Verdict on Breach of Contract Claims

¶ 68        We now turn to the issues raised by the Company in its cross-appeal. The Company first argues that the trial court erred in failing to grant a directed verdict on Defendant's breach of contract claims. We agree in part, and remand for a new trial on Defendant's claim for failure to perform in a workmanlike manner under a construction or building contract.

¶ 69        To review, Defendant argued at trial that the Company committed a breach of contract in three main respects:  (1) by installing different equipment than was originally called for (such as the water heaters); (2) by charging a higher price than was originally called for; and (3) by performing substandard work, such as on the re-piping and insulation projects. During trial, the Company moved for a directed verdict at the close of all the evidence, and the trial court heard extensive arguments from both parties regarding whether the breach of contract claims should go to the jury. The trial court ultimately denied the Company's motion, concluding that there was sufficient evidence presented that would allow the jury to reach their own conclusions on whether the contract had been breached.

¶ 70    Following the close of all evidence during a jury trial, a party may move for a directed verdict in order to "test[] the sufficiency of the evidence to support a verdict for the non-moving party." *Williams v. CSX Transp., Inc.*, 176 N.C. App. 330, 344, 626 S.E.2d 716, 728 (2006). If the trial court allows the motion for directed verdict, judgment is awarded in favor of the moving party and the matter will not be decided by the jury—however, if the trial court denies the motion, then the case moves forward to be decided by the jury. *See* N.C. Gen. Stat. § 1A-1, Rule 50(a) (2019).

¶ 71    "In reviewing a direct verdict, this Court must determine whether the evidence taken in the light most favorable to the non-moving party is sufficient as a matter of law to be submitted to the jury." *Delta Env't Consultants of N. Carolina, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 168, 510 S.E.2d 690, 695 (1999). On appeal, we conduct a *de novo* review of a trial court's denial of a motion for directed verdict. *Denson v. Richmond Cnty.*, 159 N.C. App. 408, 411, 583 S.E.2d 318, 320 (2003).

¶ 72    We first address the Company's claim that the trial court should have issued a directed verdict as to Defendant's claim that the Company performed substandard work on the re-piping and insulation projects. The Company's primary argument here is that, as a matter of law, Defendant's evidence could not have been sufficient to survive a motion for directed verdict because he did not present any expert testimony showing that the Company's work was substandard. During trial, the only

evidence presented by Defendant tending to show substandard work by the Company was Defendant's own testimony about the quality of the work and photos that Defendant had taken of the work.

¶ 73        "To state a claim for breach of contract, the complaint must allege that a valid contract existed between the parties, that defendant breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach." *Jackson v. Associated Scaffolders & Equip. Co.*, 152 N.C. App. 687, 692, 568 S.E.2d 666, 669 (2002).  In actions for breach of building or construction contracts, a plaintiff may bring a claim for "failure to construct in a workmanlike manner." *Cantrell v. Woodhill Enters., Inc.*, 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968).  Under such a claim, "[t]he law recognizes an implied warranty that the contractor or builder will use the customary standard of skill and care" based upon the particular industry, location, and timeframe in which the construction occurs. *Kenney v. Medlin Const. & Realty Co.*, 68 N.C. App. 339, 343, 315 S.E.2d 311, 314 (1984).  When pleading this claim, "plaintiff's pleading should allege wherein the workmanship was faulty or the material furnished by defendant was not such as the contract required." *Cantrell*, 273 N.C. at 497, 160 S.E.2d at 481 (internal marks and citation omitted).

¶ 74        The Company contends that, in order to bring a proper claim for failure to construct in a workmanlike manner, the plaintiff must put on expert testimony to establish the relevant standard of care.  Defendant contends that no such

requirement exists, as the quality of the work is an issue that can be properly determined by the jury without the aid of an expert. On balance, we agree with the Company that at least some expert evidence must be presented to sustain a claim such as this.

¶ 75        We find two cases to be most instructive on this issue. First, in *Kenney v. Medlin Const. & Realty Co.*, 68 N.C. App. 339, 341, 315 S.E.2d 311, 313 (1984), we addressed a breach of contract action in which the plaintiff homeowner sued the defendant builder for failure to construct in a workmanlike manner when building the plaintiff's new home. Plaintiff retained two experts to testify regarding the structural problems with the home, and both testified that "the construction of plaintiff's house did not meet the standard of workmanlike quality prevailing in Cabarrus County in December, 1978." *Id*. at 340, 315 S.E.2d at 312. On appeal, the defendant argued that the testimony of the two witnesses was inadmissible because they were not sufficiently qualified, but we disagreed. *Id*. at 342, 315 S.E.2d at 313.

¶ 76        We noted that "opinion testimony of an expert witness is admissible if there is evidence that the witness is better qualified than the jury to form such an opinion." *Id*. Given that one of the witnesses had "built most of the houses in plaintiff's subdivision," and that the other "had been involved in building more than 200 residences," we held that both witnesses qualified as experts who were "better qualified than the jury to form an opinion as to the quality of the workmanship" on

the home. *Id*. at 342-43, 315 S.E.2d at 313-14. Moreover, in evaluating whether the trial court properly denied the defendant's motion for directed verdict, we held that there was "plenary evidence supporting plaintiff's claim of breach"—given that "two expert witnesses testified to the various structural defects rendering the quality of construction of plaintiff's house below the standard prevailing in the area." *Id*. at 343, 315 S.E.2d at 314.

¶ 77 Second, in *Delta Env't Consultants of N. Carolina, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 163, 510 S.E.2d 690, 692 (1999), the defendant (a factory owner) hired the plaintiff (an environmental consultant) to help the factory deal with pollution and soil contamination. The plaintiff sued the defendant for unpaid bills, and the defendant counter-claimed that the plaintiff had breached the contract by "fail[ing] to perform its remedial work to the level of skill ordinarily exercised by members of its profession." *Id*. During trial, the defendant apparently put on no expert testimony to prove its workmanship claim, and as a result the trial court granted a directed verdict in favor of plaintiff, ruling that defendant's "failure to offer expert testimony made its evidence insufficient to prove the standard of care owed by [plaintiff] as a matter of law." *Id*. at 168, 510 S.E.2d at 695.

¶ 78 On appeal, the defendant challenged this ruling by the trial court, arguing that under the "common knowledge" exception, it need not introduce expert testimony to prove its workmanship claim. *Id*. This exception holds that "where the common

knowledge and experience of the jury is sufficient to evaluate compliance with a standard of care, expert testimony is not needed." *Id.* However, we disagreed with the defendant, concluding that a case such as this fell far outside the bounds of the common knowledge exception. *Id.* We explained that this exception was reserved for cases where the complained-of professional conduct "is so grossly negligent that a layperson's knowledge and experience make obvious the shortcomings of the professional"—such as a medical malpractice case in which "an open wound was not cleansed or sterilized" before being placed in a cast. *Id.* at 168, 510 S.E.2d at 696 (citing *Little v. Matthewson*, 114 N.C. App. 562, 442 S.E.2d 567 (1994)).

¶ 79        In contrast, we held that a case involving the workmanship "utilized by professional engineers for environmental cleanup" was not the type of common-sense issue that could be determined by a jury alone. *Id.* Thus, given the lack of "required expert testimony to explain and prove the standard of care," we held that the trial court did not err in granting the motion for directed verdict. *Id.*

¶ 80        The core of a workmanship claim is a claim that a professional failed to utilize "the customary standard of skill and care" in completing a project, based upon the particular industry, location, and timeframe in which the project occurred. *See Kenney,* 68 N.C. App. at 343, 315 S.E.2d at 314. And in most cases, the average juror would not have the requisite knowledge and experience to evaluate the prevailing professional standards in a particular industry and area.

¶ 81        As recognized by the "common knowledge" exception, there are certainly some types of workmanship claims that can routinely be determined by a jury without the aid of an expert. *See Delta*, 132 N.C. App. at 168, 510 S.E.2d at 696. These are matters where the workmanship is so grossly subpar that it is obvious to any layperson that the work does not live up to a professional standard of care—such as a surgeon "[leaving] a sponge in a patient's body during surgery," or a lawyer "who is ignorant of the applicable statute of limitations or who sits idly by and causes the client to lose the value of his claim." *Little*, 114 N.C. App. at 569, 442 S.E.2d at 571.

¶ 82        This case is not like those cases. This case involved $16,324 worth of extensive plumbing work done throughout an entire home, encompassing removing and replacing all polybutylene piping with PEX piping "within reason." An employee of the Company testified that "the scope of the work was massive." Moreover, the contract expressly stated that the Company was under no obligation to repair or replace the drywall that would inevitably be cut open during the re-piping.

¶ 83        It is undisputed that Defendant did not offer any expert testimony to demonstrate that the plumbing work was not performed in a workmanlike manner. Instead, Defendant offered his own lay-testimony of why he believed the plumbing work was inadequate, and he introduced 12 photographs showing the allegedly inadequate piping and insulation work. We have examined these photographs, and we see no evidence that would indicate to a layperson that the plumbing work was

obviously or grossly defective. Accordingly, as in *Delta*, we conclude that the common knowledge exception does not apply, and that expert testimony was required as a matter of law in order to prove Defendant's workmanship claim against the Company. Because Defendant presented no expert testimony, we hold that the trial court erred in failing to grant the Company's motion for directed verdict. We reverse and remand for a new trial on this claim.

¶ 84        As for Defendant's remaining breach of contract claims—failure to provide the correct water heater called for in the contract, and charging a higher price than called for—we conclude sufficient evidence was presented to allow these claims to proceed to the jury. These claims were based in a standard breach of contract cause of action (as opposed to a workmanship claim) and thus did not require the presentation of expert testimony. Defendant presented competent testimonial evidence tending to show that a 40-gallon tank was installed instead of a 50-gallon tank, and that the price of the 7 November contract was higher than the price of the 2 November contract. While the Company presented contrary evidence, the evidence presented by Defendant on these claims was sufficient to allow those claims to proceed to the jury. We accordingly hold that the trial court did not err in refusing to grant a directed verdict on Defendant's remaining breach of contract claims.

**D. Attorneys' Fees**

¶ 85        The Company next argues that the trial court erred in failing to allow the

parties to be heard regarding the award of attorneys' fees, and Defendant agrees. However, because neither party obtained a ruling on the request for attorneys' fees, this issue has not been preserved for our review.

¶ 86 Our General Statutes provide as follows regarding the award of attorneys' fees in a UDTP action:

> In any suit instituted by a person who alleges that the defendant violated G.S. 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party, such attorney fee to be taxed as part of the court costs and payable by the losing party, upon a finding by the presiding judge that:
>
> (1) The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit; or
>
> (2) The party instituting the action knew, or should have known, the action was frivolous and malicious.

N.C. Gen. Stat. § 75-16.1 (2019).

¶ 87 However, under Rule 10 of the North Carolina Rules of Appellate Procedure, "to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). In addition, Rule 10 requires that "the complaining party [] obtain a ruling upon the party's request, objection, or motion."

*Id.*

¶ 88        Here, though both Defendant and the Company had previously indicated on multiple occasions that they wished to be heard on attorneys' fees, the trial court never held a hearing on attorneys' fees, and never ruled on Defendant's request for attorneys' fees.  This issue therefore has not been preserved for appellate review.

**E.  Closing Arguments**

¶ 89        Finally, the Company argues that the trial court erred when it implicitly disallowed the Company to make the final closing argument to the jury.  We disagree, and hold that the trial court did not abuse its discretion in its ordering of the closing arguments in this case.

¶ 90        The basis of the Company's argument is that the unique procedure posture of this case—in which the Company acted as both plaintiff and defendant—resulted in the Company not being able to make its final argument to the jury regarding its defense to Defendant's counterclaims.  The Company contends this resulted in unfair prejudice, as it left the jury with the false impression that the Company had no defense to Defendant's UDTP and breach of contract claims.

¶ 91        The Company's argument is based in Rule 10 of the General Rules of Practice for the Superior and District Courts.  *See* N.C. Super. and Dist. Ct. R. 10 (2020).  Rule 10 provides, in pertinent part, as follows:

>           In all cases, civil and criminal, if no evidence is introduced

by the defendant, the right to open and close the argument to the jury shall belong to him. If a question arises as to whether the plaintiff or the defendant has the final argument to the jury, the court shall decide who is so entitled, and its decision shall be final.

N.C. Super. and Dist. Ct. R. 10 (2020).

¶ 92    This Rule means that, generally, after the plaintiff introduces their evidence, and the defendant chooses to introduce no rebuttal evidence, then the defendant is entitled to be the final party to make arguments to the jury. Here, trial arguments proceeded in the following order: (1) the Company presented evidence on its breach of contract claims; (2) Defendant presented evidence on his breach of contract and UDTP counterclaims; (3) the Company made closing arguments on its breach of contract claims; and (4) Defendant made closing arguments on his breach of contract and UDTP counterclaims.

¶ 93    At the end of the Company's initial closing, counsel for the Company indicated that he intended to "come back up and talk to" the jury one more time in order to put forth the Company's rebuttal to Defendant's counterclaims. Defendant's counsel objected, asserting that the Company did not have the right to make a rebuttal argument, and that "anything he has [for closing], he says now." The following exchange then occurred:

> **[The Court]:** Was that your closing, sir?
>
> **[Counsel for the Company]:** If I don't get a rebuttal, I

don't get a rebuttal. That's fine, Judge.

**[The Court]:** All right.

**[Counsel for the Company]:** I was under the presumption of a rebuttal, but okay.

¶ 94 Counsel for Defendant then proceeded to make his closing, and no further discussion occurred regarding the Company's desire for a rebuttal.

¶ 95 This exchange demonstrates the Company did not adequately object to this issue to preserve it for appellate review, and arguably waived any challenge. To recapitulate, under Rule 10, to preserve an issue for appellate review, "a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make." N.C. R. App. P. 10(a)(1). If a party fails to object to a certain ruling or action by the trial court, then the matter is deemed waived. *See State v. Holliman*, 155 N.C. App. 120, 123, 573 S.E.2d 682, 685 (2002).

¶ 96 Here, it would strain credulity to conclude that the Company's statements regarding the rebuttal argument amounted to an objection. When Defendant stated that the Company was not entitled to a rebuttal, the Company could have easily objected and asserted that it was, indeed, entitled to a rebuttal under Rule 10 of the General Rules of Practice. However, the Company did not make such an objection—instead, counsel stated "If I don't get a rebuttal, I don't get a rebuttal. That's fine, Judge." We hold that this did not qualify as an objection within the meaning of Rule

10 of the Rules of Appellate Procedure, especially given that counsel did not "stat[e] the specific grounds for the ruling the party desired the court to make." N.C. R. App. P. 10(a)(1).

### III.    Conclusion

¶ 97          In sum, we hold as follows:

(1) **UDTP Claims:** The trial court correctly concluded that Defendant's UDTP claims must fail as to the superimposition of the signature (given that Defendant cannot show actual reliance on the 7 November contract), and as to the installation checklist (given that Defendant cannot show any injury associated with the checklist). However, the trial court erred in concluding that Defendant's UDTP claim must fail as to the duplicate warranties, and we remand for further fact-finding as to the reasonableness of Defendant's reliance on the contractual warranties.

(2) **Amendment of the Counterclaim**: The trial court did not abuse its discretion in refusing to allow Defendant to amend his counterclaim during trial to add a new collections claim, because Defendant acted with undue delay.

(3) **Directed Verdict**: The trial court erred as a matter of law in failing to grant the Company's motion for directed verdict as to Defendant's

workmanship claim, as Defendant failed to present any supporting expert testimony as required under our precedent. As for Defendant's remaining breach of contract claims, the trial court correctly refused to grant a directed verdict as sufficient supporting evidence had been presented.

(4) **Attorneys' Fees**: This issue has not been preserved for our review.

(5) **Closing Arguments**: Defendant has not preserved this argument for appellate review, and in any event the trial court did not abuse its discretion in the ordering of closing arguments.

AFFIRMED IN PART, REMANDED IN PART.

Judge TYSON concurs.

Judge MURPHY concurs in Parts I, II-A, II-B, II-D, II-E, and III; and concurs in result only in Part II-C.